ANIERO CONCRETE COMPANY, INC., Plaintiff,

v.

NEW YORK CITY CONSTRUCTION AUTHORITY; and the Aetna Casualty and Surety Company, Defendants.

No. 94 Civ. 9111(CSH).

United States District Court, S.D. New York.

Dec. 23, 2003.

Charles M. Carella, Carella, Byrne, Baine, Gilfillan, Cecchi, Stewart & Olsstein, Roseland, NJ, Benjamin D. Lentz, Torre, Lentz, Gamell, Gary & Rittmaster, L.L.P., Jericho, NY, for Plaintiff.

Bob Bailey, Soraya Berg, Paul A. Crotty, Corporation Counsel of the City of New York, Monroe Weiss, Lambert, Weiss & Pisano, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

At a bench trial in this diversity action, a construction company asserted a claim against a surety company to recover in *quantum meruit* for work performed during the renovation of a high school in the Bronx. The parties exchanged post-trial main and reply briefs. Counsel presented oral summations. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a). Fed.R.Civ.P.

## I. FINDINGS OF FACT

1. Plaintiff Aniero Concrete Company, Inc. ("Aniero") is a New Jersey corporation maintaining its principal place of business in that state.

2. Defendant Aetna Casualty and Surety Company ("Aetna") is a Connecticut corporation maintaining its principal place of business in that state.

3. In July 1992 the New York City School Construction Authority ("SCA") contracted with the P.J. Carlin Construction Company ("Carlin") for a large-scale modernization and renovation of the Morris High School in the Bronx ("the Project"). Carlin was the general contractor for the Project, and retained the services of a number of subcontractors. Aetna had issued a performance bond obligating Aetna to complete the Project at its expense if Carlin failed to do so. That eventuality came to pass. Carlin was terminated from the Project, nowhere near completion, after little more than a year.

4. Aetna retained Aniero to act as replacement general contractor. At that time, Aetna and Aniero purported to enter

into a written contract referred to as the "Completion Agreement." However, the Court held in an earlier opinion that the Completion Agreement was invalid because Aetna failed to obtain the SCA's written consent of Aetna's assignment of the Carlin contract to Aniero. *See Aniero Concrete Company, Inc. v. New York City Construction Authority*, 1998 WL 148324 (S.D.N.Y. March 30, 1998). Accordingly Aniero's claim against Aetna sounds in *quantum meruit.*

5. Aniero mobilized on the job site in March, 1994. It kept on some of Carlin's subcontractors and retained others of its choosing. Aniero ceased working on the uncompleted Project on December 22, 1994, and, complaining of Aetna's delays in making payments under the purported contract, commenced this action against Aetna on that day.[1]

6. Aniero claims that Aetna owes Aniero a total amount of $4,007,620.75 in addition to the amounts Aetna previously paid to Aniero. Aetna clams that it overpaid Aniero in the amount of $2,548,174.41, and in consequence owes Aniero nothing in *quantum meruit.* Aetna did not press a claim for overpayment at the trial, although it has not abandoned that claim. The procedural posture of the case was such that at the trial Aetna confined its efforts to denying Aniero any recovery in *quantum meruit.*

7. The president and principal owner of Aniero is Stephen Crevani, Sr. (hereinafter "Crevani"). His son, Stephen Crevani, Jr. (hereinafter "Crevani Jr.") was also active in Aniero during the pertinent times.

8. Aniero was an active company from 1970 until 1995, when it withdrew from the Project. It was a general contractor, developer, and reinforced concrete contractor. During Aniero's years of operation, Crevani at one time or another performed all functions at this small company: estimating costs for bids, working and supervising at the job sites, working in the office, and overseeing all aspects of the business.

9. Having been retained by Aetna as the general contractor replacing Carlin, Aniero began work at the site of the Project during the week ending on March 25, 1994. Aniero's last day on the job was December 22, 1994.

10. Aniero established several trailers at the job site. The main trailer was used as a field office, containing computers, copy machines, fax machines, calculators, filing cabinets, and other office equipment. Aniero's permanent office was located in Hackensack, New Jersey. Other trailers at the job site were used for storage purposes and to accommodate some of Aniero's subcontractors.

11. Given the near total renovation of a large multi-story school building, it is not surprising that Aniero used the services of many subcontractors specializing in the full gamut of the building trades. The names of those subcontractors, some 95 in

1. Aniero's suit against Aetna spawned a multitude of claims, counterclaims, and third-party complaints between those and other parties, which in turn generated a number of opinions by this Court, familiarity with which is assumed. *See* 1997 WL 3268 (S.D.N.Y. Jan. 3, 1997); 1997 WL 83308 (S.D.N.Y. Feb. 27, 1997); 1997 WL 91300 (S.D.N.Y. March 4, 1997); 1998 WL 148324 (S.D.N.Y. March 30, 1998); 2000 WL 863208 (S.D.N.Y. June 27, 2000); 2002 WL 31410641 (S.D.N.Y. Oct. 25, 2002); and 2003 WL 21018842 (S.D.N.Y. May 5, 2003). At the conclusion of protracted motion practice, the Court granted Aniero partial summary judgment as to liability on a *quantum meruit* claim against Aetna. *See* 2000 WL 863208, at *11. At the trial Aniero undertook to prove the amount of that claim. A jury had been originally demanded, but when the case was called for trial the parties stipulated to a bench trial.

number, are listed in Appendix A to Aniero's Main Post–Trial Brief, and incorporated in these Findings by reference.

12. When Aniero began working on the Project in March 1994, Crevani Jr. was in charge at the job site every day. However, in May Crevani Jr. told his father that he was encountering difficulties which required his father's greater experience to confront. From May until Aniero ceased work in December 1994, Crevani was at the job site virtually every day.

13. Also present at the job site on a daily basis, working out of the Aniero trailers, were Steve Berdel, Aniero's field superintendent for the Project, and Paul Jennings, Aniero's project manager. Berdel was an employee of S2 Management, Ltd., with which Aniero contracted to obtain his services. Berdel oversaw the subcontractors, made sure that they performed their work according to plans and specifications and on schedule, checked the quantity and quality of the subcontractors' work, and reported his observations to Jennings. Jennings, a licensed architect, was employed by R.J.W. Architecture, P.C., with which Aniero contracted to obtain Jennings' services. Aniero considered that it was important to have a licensed architect as the manager of a Project which required renovations and new work to be incorporated into a large existing structure. Jennings made sure that the work performed was architecturally, structurally and mechanically correct and in accordance with the SCA's drawings. Jennings and two other individuals employed by R.J.W. Architecture reviewed and coordinated the shop drawings pursuant to which the subcontractors performed their work. Jennings, together with Berdel, reviewed the quantities of work performed by the subcontractors and, in connection with the payment requisition process described *infra*, met with representatives of Kreisler Borg Florman General Construction Co. ("KBF"), SCA's construction manager.

14. Aniero was responsible for the payment of invoices submitted to it by its subcontractors. Such payments, when made, became items of cost incurred by Aniero on the Project. Aniero periodically prepared requisitions for payment ("requisitions") by which it sought payments on account for the work it had performed and costs it had incurred on the Project during a specified time frame. Aniero submitted those requisitions to SCA, to KBF, and to Hudson International Group ("Hudson"), consultants and engineers, which Aetna, required by its surety bond to accomplish completion of the Project, had retained as "its construction consultant."[2] Carlos Guerrero was the consultant advising Aetna on the Project; he had rendered such services to Aetna in the past and worked out of Hudson's offices in this case. Hudson would review the requisitions on behalf of Aetna. The payment requisition process is further described in ¶ 23 of these Findings.

15. Two of these requisitions and accompanying correspondence are in evidence as PX 1248 and PX 1250.[3] PX 1248 includes a 12–page single-spaced "Request for Payment" prepared by Aniero covering work performed and costs incurred from June 1 through June 30, 1994. The first of these pages contains six numbered columns captioned, left to right, "Item of Work," "Total Value of Work (Dollars

---

2. The quotation is from a prior opinion of the Court, 1997 WL 3268 (S.D.N.Y. Jan. 3, 1997), at *1.

3. Aniero's exhibits admitted at trial are designated "PX" with the identifying number. Aetna's exhibits are designated "DX" with the identifying letter.

Only)," "Percent Completed," "Total Value of Work Completed," and "Value of Work Completed," the last-named column being broken down into two sub-columns captioned "Last Request (Dollars Only)" and "This Request (Dollars Only)" The column captioned "Item of Work" contains references to 27 particularized sorts of work ("Auditorium," "Structural," "Plumbing," and the like), as well as references to "All Other Work," "Exterior Work," and "Change Orders." Dollar figures or percentages (as the case may be) appear for each of these references under the respective captions. There is also a 5% deduction for "retainage" (the amount that building owners typically retain in an effort to assure that the contractor will finish the job satisfactorily). The next 11 pages contain a "detailed break down thru 06/30/94," with comparable captions; 516 separate work items are listed.

16. Aniero's "Request for Payment" forming a part of the requisition which is PX 1250 follows the same format and covers the work performed and costs incurred during the period July 1, 1994 to August 31, 1994.

17. Hudson examined Aniero's Request for Payment included in PX 1248 and, after making certain adjustments, certified the amount of $1,120,903 as the "Net Amount Due Completion Contractor this Pay Application from the Surety." [4] In the parlance of the Project, Aniero was the "Completion Contractor," Carlin was the "Defaulted Contractor," and "the Surety" was Aetna. Hudson's analysis is dated August 9, 1994, and the exhibit contains a copy of a check bearing that date and in that amount, drawn by Aetna to Aniero's order.

18. Hudson's analysis, dated September 16, 1994, of Aniero's Request for Pay-

ment forming a part of PX 1250 certified the amount of $3,064,135 as the "Net Amount Due Completion Contractor this Pay Application from the Surety." The exhibit does not contain any proof of what Aetna paid on this requisition or when it was paid.

19. It should be noted that Aniero was submitting these payment requisitions at a time when all concerned shared the impression that Aniero and Aetna had entered into a binding contract for the completion of the Project after Carlin's default. Thus it is that the Hudson documents forming parts of PX 1248 and 1250 recite that the original (Contract Sum) (Guaranteed Maximum Price) was "18,-800.000." Those documents were generated before litigation began and this Court eventually held that the Completion Contract between Aniero and Aetna was invalid, see fn. 2, supra, thereby transforming Aniero's claim against Aetna from one sounding in contract to a claim in quantum meruit.

20. As noted, Aniero also submitted its requisitions for payment for review by KBF, the SCA's technical representative, which performed the oversight functions for SCA that Hudson performed for Aetna.

21. Aniero's requisitions were accompanied and supported by detailed documentation. For example, Crevani testified that "[e]very subcontractor had to submit a certified payroll" at the end of each month, and "[w]hen we submitted the final requisition, all that paperwork every month had to be submitted to Kreisler Borg, the representative of the SCA." Tr. 671. A subcontractor would submit to Aniero a less formal "work sheet" on a weekly basis, which Aniero, after checking the claimed hours with Berdel and Jennings, would use to compute how much to

4. I have quoted from the third page of PX 1248, bearing Bates number 5A 06712.

pay the subcontractor "every week"; Crevani continued:

Then, also, at the end of the month, then he [the subcontractor] backed it up with the certified payroll that we had to submit to the SCA for final payment of our requisition. Without the certified payroll and all the documentation, they would not process our requisitions.

Tr. 679. Crevani expanded on this subject during re-direct examination:

Q. Now, Mr. Crevani, you indicated that, and you indicated this on cross-examination, I believe you said it just again, that the certified payrolls are part of the package that's submitted?

A. That's correct, to Kreisler Borg in conjunction with the other paperwork for payment of our requisition for the month.

Q. Could Aniero have gotten paid without a submission of certified payrolls to Kreisler Borg?

A. No, they would not have paid us. They would not process the requisition unless they received all the paperwork. That's part of the paperwork.

Q. Did Kreisler Borg, to your knowledge, review the certified payroll to determine whether or not the certified payrolls were accurate?

A. Yes, they did.

MR. LEPELSTAT [counsel for Aetna]: Objection.

THE COURT: If he knows.

A. [by the witness] Absolutely. As a matter of fact, on one occasion or two occasions, I believe it was one occasion, they had some questions about it. They brought in one of our subs because of one of the categories he put down. They had meetings with the agency that represented New York School Authority in reference to the classification because they wanted to make sure it was in conjunction with prevailing wages. That was all resolved and it was fine. But they definitely, absolutely reviewed everything, yes.

Q. Is the accurate nature of the certified payroll forms that were submitted to Kreisler Borg and then to the SCA something that, if you know, was critical to Kreisler Borg and SCA?

A. Yes.

Tr. 755–6.

22. I accept this testimony as an accurate description of the processes by which Aniero supported and submitted its requests or requisitions for payment to Kreisler Borg and the SCA (as well as to Hudson and Aetna).

23. Carlin, the defaulted contractor, had submitted 16 requisitions to the SCA before being discharged from the Project, numbered 1 through 16. Aniero submitted five requisitions of its own before leaving the Project in December 1994. Aniero started its own sequence of numbers, but those in charge of the Project also retained the numbering that began with Carlin. Thus Hudson's communication dated August 9, 1994 (PX 1248) references "Aniero Requisition # 2 / NYCSCA # 18," and its September 16, 1994 communication (PX 1250) references "Aniero Requisition # 3 / NYCSCA # 19." Using the SCA numbering, Aniero formally submitted requisition numbers 17, 18, 19, 20, and 21 to the SCA and the technical supervisors, KBF and Hudson. Aniero also prepared a "pencil copy" for Requisition 22 and prepared a draft of Requisition 23 at its office, but these were not formally submitted for payment. With respect to requisitions submitted by Aniero, the procedure was that if SCA, advised by KBF, approved the requisition, SCA sent a check for the authorized sum to Aetna. SCA's payment to Aetna would trigger a payment by Aetna to Aniero of an amount approximately 21

% higher than SCA's payment to Aetna. The reason for that increase is that SCA's obligations were governed by the defaulted Carlin contract, which had a fixed maximum amount of $18,800,000. When Carlin defaulted, Aetna became responsible under its performance bond to complete the Project at a total cost to SCA that did not exceed the Carlin contract, which at that time had some $14,000,000 remaining to be spent. However, Aniero's winning bid to Aetna to be the completion contractor was in a higher amount than that, and so every payment that Aetna made to Aniero included a "roughly right around 21 percent premium that was paid over and above what the SCA paid Aetna." [5] KBF and SCA approved all five of Aniero's submitted requisitions. The fifth Aniero requisition covered work on the Project during October 1944. Aniero submitted the requisition to SCA, which paid the authorized amount to Aetna. Aetna then cut a check in the amount of $315,000, payable to Aniero, but for some reason the record does not reveal Guerrero, whose responsibility it was, never delivered the check to Aniero.[6]

24. The parties stipulated at trial that while Aniero was performing work on the Project, Aetna paid Aniero a total of $6,781,069, and also credited Aniero with $25,000 in respect of windows used on the Project and paid for by the SCA. The trial came about because Aniero claims that it is owed in *quantum meruit* more than Aetna paid, while Aetna claims that Aniero was overpaid.

25. Aniero's proof at trial showed that it frequently made payments "on account," usually in round figures, to subcontractors. Crevani described the necessity for making these payments on account during his direct testimony:

Almost every single sub[contractor] we paid basically on account because we didn't receive payment for our first requisition for like three months into the project. As a matter of fact, we were on the project eight months and we only received four payments. So most of our subs in order to sustain them to continue to do work there we had to pay them money, and so we paid almost every one of our subs on account.

Tr. 43.

26. For the most part, Aniero's proof of payments "on account" to subcontractors consisted of the cancelled checks, some accompanied by minimal supporting documentation, others with no supporting documents. With respect to each such check, Crevani gave substantially similar testimony. An example is furnished by the on account payments Aniero made to Chapman & Evans, Inc., the subcontractor for heating, ventilating and air conditioning ("HVAC"). Crevani testified on direct examination:

Q. I show you then a check marked P204 and ask you, have you ever seen that, and what that check is for?

A. That was also a check for $10,000 for June 17 paid on account, the actual check.

Q. It was paid to Chapman & Evans?

A. Yes, it was.

Q. Again, Mr. Crevani, at the time these on account payments are made, the work which had been performed by Chapman & Evans up until that time was equal to or in excess of the total amount that you were paying?

A. Yes.

Tr. 57. A main thrust of Crevani's trial testimony was that every subcontractor

---

5. Guerrero, Tr. 1008.

6. Guerrero, Tr. 1021–23.

who received a payment "on account" from Aniero had, at the time of the payment, performed work at the Project or furnished materials to the Project of a value equal to or in excess of the amount of the on account payment.

27. The procedure by which Aniero ascertained that the value of a subcontractor's work was equal to or in excess of a payment on account at the time the payment was made was described by Crevani in an exchange with the Court:

> THE COURT: Now, tell me, you may have told me earlier, but tell me again, how it comes about that a particular amount, such as the amounts appearing on Exhibit 444A, are calculated in order to quantify the payment on account?
>
> THE WITNESS: Like I previously stated before, my son at that time and myself, myself or my son, plus my superintendent, field superintendent, Steve Berdel,[7] he would actually walk through with each subcontractor that was requesting payment and analyze the amount of work to see if it was equal or more than the moneys they were requesting. And the volume of the work that they performed, if he was satisfied and he would negotiate back and forth with them, in some cases he just said, Look, if right now we are not getting money from them,[8] you will have to be satisfied with this amount, even though he feels that the volume of work that they performed is more. But in no case ever did we pay a subcontractor more money than the volume of the work they performed. So it would have to be OK'd by Steve Berdel and Paul Jennings, my

project manager, and either myself or Steve that was on the job at the that time.

> THE COURT: You have described for me, have you not, the practice that you followed in the business with respect to calculating the amount of payment on account that should be made to any particular subcontractor?
>
> THE WITNESS: Absolutely. You check the unit prices, you see the amount of linear feet of electrical wiring he does, you see the amount of fixtures that he would put in, you see the amount of work on intercoms, if he worked on alarm systems, you calculate the amount of volume of work that he had performed and there—you have unit prices for each of these items, and you would multiply it out and you would come up to a figure and then you would come up with the gross amount of work that he performed, ten you deduct retainage, and then approve X amount. That's the normal procedure.

Tr. 100–101.[9]

28. The cross-examination of Crevani by counsel for Aetna made it plain that with respect to such payments to subcontractors "on account," Crevani was unable (in the absence of any supporting vouchers or invoices) to recall at trial the precise amount of labor performed or materials supplied by the subcontractor in question at the time of the payment. The following testimony with respect to two payments Aniero made to Promo Pro, Inc., Aniero's principal subcontractor (*see* ¶¶ 29–30, *infra*), is typical:

---

7. The transcript reads "Bardo." I have corrected the spelling of the last name to "Berdel."

8. I take this to mean that Aniero was not getting payments from Aetna.

9. This exchange occurred in the context of the Court's ruling on the admissibility of documents relating to work performed by electrical subcontractors. Crevani's responses to the Court have a broader significance because they describe generally the manner in which Aniero calculated the amounts of payments on account to all subcontractors.

Q. [by counsel for Aetna, on cross-examination]: I turn your attention to Exhibit 482, a check from Aniero Concrete to Promo Pro dated June 24, 1994, for $16,000. Is this another one of those payments which you've described as payment on account, sir?

A. Yes, it is.

Q. And do you not know the total number of man-hours that Promo Pro had expended on the project as of the date of this payment, dated June 24, 1994?

A. At that time, they exceeded the number—the hours and the labor and the materials exceeded the amount of money I paid them.

Q. But you can't testify as to the total number of man-hours expended on the project by Promo Pro as of the date of this payment, correct?

A. As we sit here, as of the date of the payment I could, but not as we sit here today.

Q. Nor could you testify as to the total quantity of carpentry work performed by Promo Pro on the project as of the date of this payment; isn't that correct?

A. I could at that date but not at this date.

Q. And isn't it further true that you cannot testify as to the total quantity of demolition work performed by Promo Pro on the project as of the date of this payment, June 24, 1994?

A. Not today.

 * * * * * *

Q. Let's take a look at Aniero Exhibit 496, which is a check to Promo Pro dated September 22, 1994 in the sum of $115,000. Do you see that check?

A. Yes, I do.

Q. Was this another payment made to Promo Pro on account?

A. Yes, it was.

Q. As you sit here today, do you know the total quantity of carpentry work which Promo Pro performed on the pro-

ject as [of] the date of this check which is dated September 22, 1994?

A. As I stated before, I don't know today, but when I wrote this check I knew definitely this payment was less than the value of the work that he had already performed.

Q. And do you know the total quantity of demolition work which Promo Pro had performed on the project as of the date of this check?

A. Same answer.

Q. You don't know.

A. As I sit here today. But at the time of the check I did.

Tr. 658, 682–3. Crevani gave comparable testimony with respect to all payments on account to subcontractors where Aniero's files at the time of trial did not contain detailed invoices, vouchers or payrolls referring to the payments.

29. Notwithstanding Crevani's inability at the trial, in the absence of supporting documents, to describe in detail the number of hours of work performed or materials supplied by a particular subcontractor at the time of a payment on account by Aniero to that subcontractor, I accept as credible Crevani's testimony concerning Aniero's payments on account to subcontractors and the procedures by which the amounts of those payments were calculated. Specifically, I accept Crevani's testimony that at the time of such a payment to a subcontractor, the value of the work performed or materials furnished by the subcontractor equaled or exceeded the amount of the on account payment. The reasons why I accept that testimony are stated more fully in Part II.D.1., *infra.*

30. It follows that I find that Aniero's payments on account to its subcontractors establish for *quantum meruit* purposes the fair and reasonable value of the work performed and the materials furnished by

the subcontractors in question at the time Aniero made the payments. The amounts of Aniero's payments to subcontractors, which Aniero includes in its *quantum meruit* claim against Aetna, are proved with respect to each payment to each subcontractor by the original, endorsed checks drawn on Aniero's account, which were received in evidence on Aniero's case in chief.

31 The pattern of payments on account by Aniero to its subcontractors described in the preceding paragraphs was altered somewhat by its payments to the subcontractor to which Aniero paid by far the largest amount: Promo Pro Ltd. Promo Pro, which had the most manpower of any of the subcontractors, performed demolition work, rough and finished carpentry work, renovation of the auditorium, cleaning work, and other tasks at the Project. In addition, the principal of Promo Pro, one Lakis Papadopoulos, assisted Aniero in settling disputes with other subcontractors, responded to emergencies arising at the Project, and eventually took over the window installation work at this very large school building.

32. While originally Aniero had contemplated entering into a lump sum contract with Promo Pro for the carpentry and miscellaneous work, Promo Pro's expanding responsibilities led to an agreement that Aniero would pay Promo Pro on a time and material basis for the work Promo Pro performed at the Project.

33. Ultimately the amounts Aniero paid to Promo Pro for labor and materials Promo Pro supplied to the Project totaled $1,387,590.79. The nature of these payments varied over time. At the beginning of Promo Pro's involvement, in May 1994, Aniero made an "on account" advance payment of $200,000 to cover Promo Pro's mobilization on the Project, and the purchase of materials and special machinery to fabricate woodwork for the auditorium.

There was a particular reason why important subcontractors such a Promo Pro had to be paid in advance by Aniero to obtain materials from third-party vendors. Crevani testified, and I find, that "a lot of people were owed money, a lot of vendors were owed money from the previous contractor," the defaulted Carlin, so that the Project had acquired an unfavorable "stigma," with the result that "everybody, all the vendors, were very reluctant to do business in reference to that Project," so that "all the major subs, including Promo Pro and everybody else, had difficulty because they needed money up front to buy materials." Tr. 206.

34. During June and July, Aniero made additional "on account" payments to Promo Pro with respect to labor and materials Promo Pro supplied to the Project. During August, September, October, November and December, most of the payments Aniero made to Promo Pro were for payroll, that is, to cover the wages of Promo Pro employees working on the Project. Ordinarily, Crevani testified, during the course of a job a subcontractor (such as Promo Pro) pays its own employees their wages and then bills the general contractor (here Aniero) for labor and materials. The general contractor, in turn, includes those charges in one of its periodic payment requisitions addressed to the building owner, then the general contractor "would pay that sub." Tr. 254. However, that orderly procedure could not be followed on this Project because, as Crevani testified and I find, Aniero encountered delays in receiving payments from Aetna ("it took us four months to get our first requisition," Tr. 254), with the result that Aniero had to undertake to pay its subcontractors' ongoing payrolls "in a lot of cases," including that of Promo Pro. Tr. 255. The checks which Aniero wrote to Promo Pro for payroll purposes, which are

in evidence, were endorsed by Promo Pro for deposit into its payroll account.

35. Frustrated by the delays Aniero had encountered in receiving payments from Aetna on its requisitions, Aniero ceased work on the Project and left the job site on December 22, 1994. A number of Aniero's subcontractors pressed claims against Aniero for additional amounts the subcontractors contended they were owed. Those subcontractors included Alpha Omega Restoration Corp. ("Alpha"), Total Construction Co., Inc. ("Total"), Exeter Architectural Products Corp. ("Exeter"), and U.S. Flag Security Systems ("Flag"). Aniero settled these claims, but in order to fund the settlements found it necessary to borrow the amounts from General Accident Insurance Company of America ("General Accident"), Aniero's bonding company for the Project. Specifically, Aniero borrowed $235,000 from General Accident to settle Alpha's claims; $95,000 to settle Total's claims; $18,964.15 to settle Exeter's claims; and $13,000 to settle Flag's claims. Each loan was evidenced by an interest-bearing promissory note given by Aniero to General Accident, secured by a collateral assignment of partnership interests executed by Aniero and Crevani personally. See. e.g., PX 51 (the promissory note covering the $235,000 Aniero borrowed from General Accident to settle Alpha's claims). Subsequently Aniero entered into a settlement with CGU Insurance Company, General Accident's successor in interest, pursuant to which Aniero repaid these loans, which totaled $361,964.15.

36. One subcontractor with whom Aniero engaged in litigation was Degmor, Inc., the asbestos removal subcontractor at the Project. Aniero made "on account" payments to Degmor, in the manner previously described, which total $135,000. But Degmor claimed that it was owed more for the work it performed on the Project, and

has sued Aniero and General Accident in a New York state court, demanding $300,000. Aniero asserted counterclaims. The action was pending at the time of the trial of the instant case. Crevani had offered his opposite number at Degmor an additional $100,000 to settle the case, but Degmor rejected the offer at the time. Crevani testified at the trial that by his estimate, the value of the work performed by Degmor for which it had not been paid was $100,000. While this Opinion was in preparation, counsel for Aniero advised the Court that the state court case was settled by payment of an additional $150,000 by Aniero to Degmor. Counsel asked the Court to reopen the record to receive proof of that settlement. Aniero's position now is that it is entitled to include in its *quantum meruit* claim against Aetna the $135,000 previously paid to Degmor and the additional $150,000 called for by the settlement. Counsel for Aetna objected to reopening the record for that purpose. I reopened the record and have received a transcript of the state court hearing at which the settlement amount was memorialized, but reserving decision with respect to its recoverability as part of Aniero's claim against Aetna. That question is discussed in Part II.H., *infra.*

37. In one instance, Aniero recovered money from a subcontractor. Aniero's electrical subcontractor on the Project was Lazer Electrical Corp. ("Lazer"), with whom Aniero had a less than harmonious relationship. Laser was not satisfied with the $728,000 Aniero paid it for work at the Project. Apparently Aniero's contract with Lazer contained an arbitration clause, and Lazer commenced an arbitration proceeding against Aniero, seeking an award of additional payments. Aniero filed a counterclaim in the arbitration proceeding, contending that as the result of payments for the same work by SCA and Aniero, Lazer had been overpaid. The arbitration

resulted in an award directing Lazer to pay Aniero $238,000. Lazer did not pay the award. Aniero sued Lazer in a New York state court to confirm the award and enter judgment upon it. Lazer opposed that action and lost, but refused to pay the resulting judgment. Aniero sought to execute on its judgment by levying against monies SCA owed Lazer for work performed at the Project after Aniero left it. That action prompted SCA to start a state court interpleader action. Aniero prevailed in that action. Ultimately Lazer paid Aniero the sum of $238,317.67 in respect of this matter. No fee-shifting provisions applied to the case, so Aniero had to bear its share of the costs for the arbitration proceeding in the amount of $8,800; attorney's fees incurred for the arbitration and first civil action against Lazer in the amount of $99,846.90; and attorney's fees and costs incurred for the SCA interpleader action in the amount of $22,989.03. These fees and costs served to reduce Aniero's net recovery on its arbitration award against Lazer to $106,681.74.

38. After Aniero left the Project on December 22, 1994, its forces withdrew to Aniero's headquarters in Hacksensack. Berdel, Aniero's Project field superintendent and an employee of S2 Management, Ltd., and Jennings, Aniero's Project manager and an employee of R.J.W. Architecture, P.C., while no longer at the job site, continued to perform services for Aniero at the Hackensack office. Crevani testified that Berdel and Jennings "set up the computers from the [job site] office trailer in Aniero's Hackensack office in order to analyze subcontractors' claims and close out the Project." Aniero's Main Post–Trial Brief Brief at 43. Crevani negotiated lower rates of compensation to S2 Management for Berdel's services and to R.J.W. Architecture for Jennings's services after these two individuals left the job site and

began to work out of the Hacksensack office. For that later work, Aniero paid S2 Management $45,397.24 for Berdel's services and R.J.W. Architecture $193,038.44 for Jennings's services.

39. In addition to making on account payments to certain subcontractors to help them meet their payrolls,[10] Aniero of course had its own payroll to meet. The parties stipulated to the amounts of Aniero's payroll costs for Aniero employees other than Crevani (including Crevani Jr.) and for Crevani himself. *See* Court Ex. 3. During the period April 12, 1994 through December 22, 1994, payments to other Aniero employees and the payroll tax obligations Aniero incurred in consequence totaled $350,056.78. Court Ex. 3 at ¶ 1. During the period May 12, 1994 through December 22, 1994, Crevani's salary payments and related employer tax obligations totaled $142,617.12. *Id.* at ¶ 2. These stipulated amounts total $492,673.90, which Aniero includes in its *quantum meruit* claim against Aetna; that amount reflects some relatively minor allocations Aniero made to allow for the minimal amount of non-Project related work, testified to by Crevani, that was going on at the time. The stipulation is a limited one; it states that "Aetna does not concede the value, appropriateness or allocation of the amounts set forth in paragraphs 1 and 2 as Aniero's payroll costs for the Morris High School project." *Id.* at ¶ 4.

40. It is also worth noting that the amounts of Aniero's payments to 39 subcontractors were stipulated to by the parties. Those subcontractors are listed in Appendix A to Aniero's Main Post–Trial Brief at 3–4.

41. Aniero's payments as described in these Findings, either in particular or

---

**10.** As noted, Promo Pro was one of those subcontractors. Alpha was another.

more generally, total $7,957,589.95, which Aniero claims as actual job costs in its *quantum meruit* claim. *See* Appendix A to Aniero's Main Post–Trial Brief at 5. Based upon that cost total, Aniero claims an additional 15%, or $1,193,638.49, for "overhead and profit." Aniero's proof in support of that percentage consists principally of Crevani's personal expectation. He testified on direct examination:

Q. Mr. Crevani, is it customary for Aniero in a project where the work was being performed on a cost-plus basis to assess or include an amount for overhead and profit?

A. Yes. it is.

Q. Would you tell the court on a job of this nature, extent and magnitude of the Morris High School project what Aniero would expect to receive for overhead and profit and why?

A. Yes. Aniero would expect to receive 15 percent overhead and profit in a job of that magnitude.

Tr. 573. Responding to a question by the Court, "15 percent of what?", Crevani said: "15 percent of your actual costs." *Id.* Crevani then expanded somewhat on this concept:

THE COURT: Let me withdraw my question and ask it a different way. Of the 15 percent, Mr. Crevani, what portion is overhead and what portion is profit?

A. When we calculate overhead and profit, it's not an exact percentage for each item. It could vary based on the percentage of work or the quantity of work that you have at the time. Because basically you have like a fixed overhead with our yard and our office, and if you have a tremendous amount of work going, then you would allocate your overhead and it would be a less percentage. If you don't have that much work going on, then of course the percentage of the overhead is going to

be a little bit more, and so that would reduce the profit.

So based on that, of course the more—it's still 15 percent total in its entirety, but it will fluctuate. Sometimes it will be 10 percent for profit, 5 percent for overhead. Sometimes it may be 9 percent and 6 percent. It will fluctuate. But the total aggregate of both would be 15 percent.

Tr. 574. Aetna's principal contention on this aspect of the case is that this proof is insufficient in law to sustain any allowance for overhead and profit.

42. Appendix A to Aniero's Main Post–Trial Brief sets forth the calculations of its *quantum meruit* claim against Aetna. Adding the overhead and profit claim of $1,193,638.49 to the total job costs of $7,957,589.95 gives a total gross claim of $9,151,228.44, against which Aniero credited the $6,781,069.00 received from Aetna and the stipulated $25,000 reduction, giving a sub-total of $2,345,159.44. To this amount Aniero added $1,195,566.97 for 9% prejudgment interest from December 22, 1994 to August 12, 2000 (the date of the judgment in Aniero's favor against Lazer), which gives a further sub-total of $3,540,726.41. Aniero then credited Aetna with $106,681.74, representing Aniero's net recovery from Lazer, which gives yet another sub-total of $3,434,044.67, to which Aniero added $473,575.58 for 9% pre-judgment interest from August 13, 2000 to December 18, 2002, giving yet another sub-total of $3,907,620.25, to which Aniero added $100,000 to reflect Crevani's evaluation of the Degmor subcontractor claim, at that time still pending in the state court. Thus Aniero's total claim against Aetna, as set forth its brief, is $4,007,620.25, an amount which, Aniero calculates, would yield $551.95 per diem interest until the entry of judgment. Those figures are subject to adjustment if Aniero is entitled, as

it contends, to increase the cost of Degmor's services from the $100,000 Crevani estimated at trial as the value of Degmor's uncompensated work to the $150,000 Aniero paid to settle Degmor's claim.

Aetna's position is that it overpaid Aniero, and in consequence owes Aniero nothing in *quantum meruit.*

## II. DISCUSSION [11]

### A. The Nature of a *Quantum Meruit* Claim

As I have held in prior opinions in this case, Aniero did not have an enforceable contract with the SCA or Aetna covering the construction work Aniero performed on the Morris High School Project. Accordingly Aniero's claim against Aetna sounds in *quantum meruit.*

■■■ Claims for unjust enrichment or *quantum meruit* "are non-contractual, equitable remedies that are inapplicable if there is an enforceable contract governing the subject matter." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir.1997) (citation omitted). *"Quantum meruit* is an equitable remedy." *McNamee, Lochner, Titus & Williams, P.C. v. Higher Education Assistance Foundation,* 50 F.3d 120, 125 n. 1 (2d Cir.1995) (citing New York cases). *"Quantum meruit* is an equitable remedy that is awarded when the circumstances are such that equity and good conscience require the defendant to make restitution." *Tappe v. Alliance Capital Management L.P.,* 177 F.Supp.2d 176, 186 n. 10 (S.D.N.Y.2001) (internal quotation marks and citations omitted). "Recovery under the *quantum meruit* theory is derived from principles of equity and fairness and is allowed where there is sub-

stantial performance but not full completion of the contract." 66 Am.Jur. *Restitution and Implied Contracts,* § 93.

Accordingly, in evaluating the rights and obligations of Aniero and Aetna, I must apply those principles of fairness that traditionally inform the decisions of a Chancellor in Equity.

### B. *Quantum Meruit* Claims in the Construction Industry

Numerous cases decided by courts in this Circuit or by New York state courts consider claims in *quantum meruit* asserted in the context of building construction projects. Certain guiding principles may be derived from that body of case law.

■■■ Under a *quantum meruit* claim, a building contractor may recover its actual job costs for work, labor and services performed and material furnished, plus an allowance for overhead and profit. The claimant bears the burden of proving its actual job costs. To sustain a judgment there must be a definite and logical connection between what is proven and the damages sought to be recovered, which cannot be speculative or conjectural. Although overhead and profit may sometimes be established as a percentage above direct costs, courts may require specific evidence of overhead and profit. In the present case, Aniero must show that the reasonable value of its work (including any allowance for overhead and profit justified by the evidence) exceeds by a sufficiently quantifiable amount the payments it has received from Aetna.[12]

11. For the sake of continuity, additional Findings of Fact are included in Part II of this Opinion, designated as such in the text when accompanied by the phrase "I find" or "the evidence shows."

12. This paragraph in text is derived from the discussion in the Court's prior opinion in this case reported at 2002 WL 31410641 at *1 (S.D.N.Y. Oct. 25, 2002) (omitting internal quotation marks and citations).

## C. Summary of the Parties' Contentions

Aniero claims "actual job costs" of $7,957,589.95, and 15% of that figure, or $1,193,638.49, for overhead and profit. From the resulting total of $9,151,228.44, Aniero deducts payments received from Aetna in the stipulated amounts of $6,781,069 and $25,000, resulting in a net claim of $2,345,159.44. Aniero also claims prejudgment interest at 9% on that amount, credits Aetna with $ 106,681.74 representing Aniero's net recovery on its claim against a subcontractor for overpayment, and adds a claim of $100,000 arising out of then-pending litigation with another subcontractor (now increased to $150,000, the amount Aniero paid to settle the case).

Aetna contends that Aniero is entitled to no recovery. It argues principally that Aniero has failed to prove the value of the subcontractors' work for which Aniero paid; that Aetna is entitled to various credits (or reductions) against Aniero's *quantum meruit* claim; that Aniero has not proved an entitlement to allowances for overhead and profit; and that Aniero should not be awarded prejudgment interest.

For the most part, this Opinion discusses those contentions in that order.

## D. Aniero's Claimed Actual Job Costs

### 1. The Nature and Quality of Aniero's Proof with Respect to Payments to Subcontractors

As noted, a major component of Aniero's *quantum meruit* claim against Aetna is a total for "job costs" of $7,957,589.95. Most of that amount represents payments Aniero made to subcontractors who performed work at or furnished materials to the Project. Aniero's proof on this aspect of the case is derived almost entirely from the testimony of Stephen Crevani, Sr. and the exhibits received in evidence during that testimony.

After the trial was concluded and post-trial briefs and reply briefs exchanged, the Court scheduled closing arguments (or summations) by counsel. In advance of those arguments, and in preparation for them, I entered and sent to counsel a Memorandum, reported at *Aniero Concrete Company, Inc. v. New York City Construction Authority*, 2003 WL 21018842 (S.D.N.Y. May 5, 2003) (the "May 5 Memorandum"). In that Memorandum I observed:

> During its performance as the general contractor at the Morris High School project during the period March–December 22, 1994, Aniero did relatively little work itself. Most of the work was performed by subcontractors retained by Aniero. For the most part, plaintiff's proof of the "actual job costs" underlying its claim consists of checks it drew to the order of the sub-contractors, denominated "payments on account.".... But there is an almost complete absence of contemporaneous explaining, detailing, itemizing, or otherwise supporting the work, labor and services performed or material furnished by the sub-contractors to whom plaintiff made these payments "on account."

2003 WL 21018842, at *1. Having read Aetna's post-trial briefs, I then said this:

> Defendant contends that this paucity of documentation constitutes a lack of proof which defeats plaintiff's *quantum meruit* claim for any amount greater than what it has been previously paid. Defendant's briefs appear to argue in the alternative: first, contending that this lack of documentation combined with Crevani's lack of personal knowledge necessarily bars plaintiff's claim; and alternatively, that the same shortcomings render his testimony unworthy of belief and devoid of probative weight. The first contention I am asked to ac-

cept as a matter of law; the alternative contention, attacking Crevani's credibility and the value of his testimony, is addressed to me as the finder of the facts.

*Id.* (footnote omitted). The May 5 Memorandum cited and analyzed a number of New York cases, cited by the parties or unearthed by the Court's research, and stated these preliminary views:

As for the first of defendant's seeming contentions, the governing New York law does not appear to include a *per se* rule that the absence of supporting documentation is fatal to a *quantum meruit* claim. . . . Given this line of New York cases, I am presently inclined to the view that such deficiencies or gaps as appear in plaintiff's documentary evidence do not preclude its *quantum meruit* claim as a matter of law. Rather, they form a legitimate basis for defendant's challenge to the credibility of Crevani as a witness and the weight of his testimony.

*Id.* at *2, *4. The May 5 Memorandum "invite[d] further argument from counsel on the point," *id. at *4.

During the closing argument of Aetna's able chief counsel, Mr. Lepelstat, I think it is fair to say that (while not formally abandoning the point) he no longer pressed the contention that a lack of supporting documentation precluded Aniero's *quantum meruit* claim as a matter of law. Counsel focused instead upon Crevani's credibility as a witness, beginning his argument by quoting from Justice Field's opinion in *Quock Ting v. United States*, 140 U.S. 417, 420–21, 11 S.Ct. 851, 35 L.Ed. 501 (1891):

Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by anyone, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony; and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there was no adverse verbal testimony adduced.

In the May 5 Memorandum I described comparable considerations, although in language which does not approach the elegance of Justice Field's:

Assuming without presently deciding that inadequate documentation does not preclude plaintiff's *quantum meruit* claim as a matter of law, a core question for the factfinder is whether this sort of testimony, given by this witness [Crevani], is (a) credible and (b) if credible, of sufficient probative weight to sustain plaintiff's burden of proof with respect to the actual job costs for which it seeks to hold defendant responsible. In making those evaluations, I will presumably apply familiar criteria: the witness's interest in the outcome; whether the witness's stated powers of recollection appear to be candid or suspiciously selective; whether his testimony is corroborated or contradicted by independent evidence in the record, testimonial or documentary; whether what the witness says is inherently plausible or implausible.

2003 WL 21018842, at *5.

■ Before considering the credibility of Crevani's testimony, I will now trans-

form the inclination expressed in the May 5 Memorandum into a holding. I hold that under New York law, gaps in or even a total absence of supporting documentation do not preclude a *quantum meruit* construction claim as a matter of law. To the extent that Aetna still argues to the contrary, its argument is rejected. The cases supporting the Court's holding are reviewed in detail in the May 5 Memorandum, which I adopt herein by reference and need not reiterate. It is sufficient for present purposes to quote again the words of the New York Court of Appeals in *D'Angelo v. State*, 39 N.Y.2d 781, 782–83, 385 N.Y.S.2d 284, 350 N.E.2d 615 (1976):

> We reject the State's contention that claims under public construction contracts must be proved by written business records which would be subject to audit by the State. We know of no statute, rule or decisional law which requires proof in such form. . . . [T]o the extent that oral testimony is credited by the trier of the facts in the absence of business records, and the claim is thus allowed, we know of no predicate on which the State can base a claim of insufficiency as a matter of law.

In this regard there is no principled distinction between a construction claim against a public body, as in *D'Angelo*, and a claim against a private entity such as Aetna, as in the case at bar. A number of New York cases cited and discussed in the May 5 Memorandum involve *quantum meruit* construction claims against private interests; they all support the holding which I now announce.

■ Accordingly the case turns principally upon the credibility of Crevani's testimony. Counsel for Aetna argued that Crevani's testimony failed to meet any of the criteria of credibility articulated in

*Quock Ting.* In counsel's submission, Crevani's testimony was inherently improbable; contradicted by facts in evidence; undermined by Crevani's lack of personal knowledge of the value of subcontractors' work, particularly with respect to the value of the work performed by Promo Pro, the largest subcontractor on the Project, a deficiency complicated by Aniero's failure to call any witnesses from Promo Pro; and tainted by Crevani's suspiciously selective preservation and loss of pertinent documents. These themes were stated at the outset of counsel for Aetna's closing argument, *see* Tr.A. 38–42,[13] further developed during the argument, and are of course set forth at length in Aetna's post-trial briefs.

Contrary to these assertions, I found Crevani to be a credible and persuasive witness. Crevani as a witness is, of course, financially interested in the outcome of the trial: none more so. But parties to commercial cases invariably stand to gain or lose financially, depending on the outcome, and so that factor can never be sufficient, standing alone, to determine credibility. The plausibility or implausibility of the witness's testimony is a more reliable touchstone. Aetna contends that Crevani's testimony is inherently improbable. In fact, the opposite is true, at least with regard to the amounts of the job costs Aniero includes in its *quantum meruit* claim against Aetna.

The core of Crevani's testimony on this aspect of the case is that each time Aniero made a payment "on account" to a subcontractor, the monetary value of that subcontractor's work performed on or materials supplied to the Project as of the date of payment was equal to or greater than the amount of the payment. That value, Crevani also testified, was not fixed arbitrarily

---

13. "Tr. A." is a reference to the transcript of the closing arguments of counsel for the parties.

by him within the sheltered confines of his Hackensack office; the determination to make a particular payment on account to a particular subcontractor was preceded by inspections and evaluations of the work or materials at the job site by Crevani, Berdel, and Jennings, who were there every day, and discussed among themselves (sometimes with participation of Crevani Jr.) the amount that should at that time be paid on account to that subcontractor

This is an inherently plausible narrative of events. Its plausibility lies principally in the likelihood that Aniero, a small company of limited resources that had to borrow from its bonding company to fund settlements of claims by sub-contractors for additional amounts, would make sure that its on account payments to sub-contractors did not exceed the value of the work the subcontractors had actually performed or the materials they had actually provided to the Project.

The core contention for Aetna must be that Aniero consistently, repeatedly, profligately and foolishly overpaid its subcontractors: showering the subcontractors with payments "on account" that vastly exceeded the value of the work performed or materials supplied by the subcontractors at the times Aniero made the payments. It is this view of events that is inherently implausible. It cannot be squared with the economic realities and practices of the heavy construction business, as revealed by this trial record; nor does Aetna's view comport with common sense. Crevani impresses one as hardheaded, not softhearted. I say this neither in praise or in condemnation; it is simply a reflection of the industry in which he labors.

On a related point, I cannot accept Aetna's contention that Crevani lacks personal knowledge of the value of the subcontractors' performances. In his closing argument, in attempted support of that contention, counsel for Aetna focused upon Aniero's payments to Promo Pro. Counsel stated: "First, I would like to note that Mr. Crevani has admitted that he does not have knowledge of the value of the work performed by Promo Pro, Aniero's largest subcontractor on the Project." Tr. A. 39. Endeavoring to demonstrate that admission, counsel read from Crevani's cross-examination, Tr. 645:

Q. By the way, you wouldn't know the value of the work performed by Promo Pro as of 4/22/94, would you?

A. Without looking at all kinds of documentation, no.

Q. You have no personal knowledge of that, do you?

A. Do I have personal knowledge right now?

Q. Yes.

A. Without looking at stuff, I don't remember eight years ago, no."

TR. A. 39–40. But Crevani did not admit to the lack of knowledge that Aetna's argument implies. Even in the testimony just quoted, Crevani limited his admission by asking: "Do I have personal knowledge *right now?*" (emphasis added). Thus he draws a sensible distinction between the knowledge he had at the time of trial, eight years after the events, and the knowledge he had at the time Aniero made payments on account to Promo Pro (and other subcontractors). That distinction was explicitly stated elsewhere in Crevani's cross-examination; *see, e.g.,* his testimony quoted in Findings of Fact ¶ 28, *supra,* and quoted again in part for the sake of this Discussion:

Q. As you sit here today, do you know the total amount of carpentry work which Promo Pro performed on the project as [of] the date of this check which is dated September 22, 1994?

A. As I stated before, I don't know today, but when I wrote this check I

knew definitely that this payment was less than the· value of the work that he had already performed.

Q. And do you know the total; quantity of demolition work which Promo Pro had performed on the project as of the date of this check?

A.. Same answer.

Q. You don't know.

A. *As I sit here today. But at the time of the check I did.*

(emphasis added). Crevani never departed or retreated from this basic assertion, which I find to be entirely credible.

As noted, this testimony is inherently plausible. Moreover, Crevani's demeanor during a number of days' testimony impressed me favorably. Accordingly I find that the amount of each payment on · account Aniero made to a subcontractor reflected the collective contemporaneous judgment of persons with the requisite knowledge that the amount was equal to or less than the value of the subcontractor's work or materials as of the date of the payment. I further find that the nature and quality of Aniero's proof at trial are sufficient to show that the values of the work and materials furnished by the subcontractors listed on pages 1–5 of Appendix A to Aniero's Main Post–Trial Brief were, at the least, equal to the amounts paid to those subcontractors, as listed in the Appendix. It follows that Aniero may recover those amounts from Aetna as parts of its *quantum meruit* claim, unless other evidence in the record bars or reduces recovery. Aetna contends that such evidence exists, and advances a number of arguments in support of that proposition. I consider those arguments in turn.

## 2. Spoliation of Evidence and Failure to Call Witnesses

Aetna argues that Aniero "failed to preserve critical documentation" related to its claims, and "failed to proffer witnesses with knowledge of the actual value of the alleged work supplied to the Project." Aetna's Main Post–Trial Brief at 59. I am urged to draw "an adverse inference against plaintiff Aniero to the extent it shall be presumed that such missing· documents and witnesses would have been unfavorable to Aniero's claim herein." *Id.* In the alternative (and in escalation of the suggested sanction), Aetna asks· the Court to "enter judgment as a matter· of law in favor of Aetna and · against Aniero with respect to the issues for which such documents pertain" [*sic* ]. *Id.* The asserted failure to preserve documents focuses upon "supporting documentation with respect to [Aniero's] claim in connection with the purported work, labor, services or materials supplied by" the leading subcontractors, including Promo Pro. *Id.* at 62.

There is no substance to Aetna's argument insofar as it is based on Aniero's failure to call witnesses other than Crevani. As the discussion in Part II.D.1., *supra,* demonstrates, Crevani's testimony, if believed (and I do believe it) is sufficient in law to sustain Aniero's *quantum meruit* claim against Aetna to recover amounts Aniero paid to subcontractors.

■■■ Aetna's criticism of Aniero for failing to offer more supporting documents as trial exhibits constitutes, as the briefs for Aetna make explicit, a charge that Aniero wrongfully committed spoliation of evidence. Spoliation is "the destruction or significant alteration of evidence or the failure to preserve the property for *another's* use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999) (emphasis added). Spoliation is sanctionable conduct; and "[t]he sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk;

and (3) restore *the prejudiced party* to the same position he would have been in absent the wrongful destruction of evidence *by the opposing party.*" *Id.* (internal quotation marks and citations omitted) (emphasis added).

The gravamen of Aetna's spoliation charge is that Aniero failed to preserve relevant documentary evidence. Since a principal purpose of the spoliation doctrine is to punish a party in litigation for prejudicing the opposing party by destroying or failing to preserve evidence useful to that other party, it is not surprising that most spoliation cases arise out of failures to comply with legitimate pre-trial discovery demands. *Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99 (2d Cir.2002), upon which Aetna primarily relies, is typical. It was a breach of contract case where the defendant sought an adverse-inference jury instruction because of plaintiff's "failure to produce certain e-mails in time for trial." *Id.* at 101. The district court refused to give the adverse inference instruction. The Second Circuit, on an appeal by defendant from a judgment in plaintiff's favor, remanded the case for further consideration by the district court on the question of sanctions. The court of appeals said at the outset that "where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, the District Court has broad discretion in fashioning an appropriate sanction," *id.,* and went on to hold that when

> an adverse inference instruction is sought on the basis that the evidence was not produced in time for trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is relevant to the party's claim or defense such that a reason-

able trier of fact could find that it would support that claim or defense.

*Id.* at 107. I had occasion to collect cases of this nature in *Pastorello v. City of New York,* No. 95 Civ. 470, 2003 WL 1740606 (S.D.N.Y. Apr. 1, 2003) (in civil rights action, granting plaintiff's application for an adverse inference instruction to the jury where gross negligence of defendant municipal hospital resulted in destruction of security officers' memo books, previously demanded by plaintiff during pretrial discovery, which might have contained entries supporting plaintiff's claims of unlawful detention and excessive medication).

Cases such as these furnish no guidance in the case at bar because during the considerable period of time leading up to the trial, Aetna never complained of Aniero's failure to produce documents demanded in discovery, or to move for sanctions based on that failure. The pre-trial document-related activity is described, without contradiction by Aetna, in Aniero's Reply Post–Trial Brief at 45:

> In this case, Aniero responded to every single document demand served upon it and repeatedly gave Aetna access to all of its project records. Those records consisted of tens of thousands of documents, plans, blueprints, spreadsheets, accounting records, cancelled checks, invoices, pay stubs and every other imaginable type of document created on a large construction project. By its own choice, Aetna did not copy all of Aniero's records but, instead, selectively marked documents which it then paid to have reproduced. Thereafter, Aetna claimed that it had not received certain documents, even though all of Aniero's records had been made available to Aetna on multiple occasions. Eventually, Aetna limited its complaints to a single cate-

gory of documents—the original checks substantiating Aniero's job costs.[14]

These circumstances do not support a charge of spoliation of evidence, in the form of subcontractors' supporting documents, by Aniero. What appears to have happened is that Aetna either was shown such documents at an earlier time and chose not to copy them, or was not shown them but made no motion for a pre-trial discovery sanction. In either event, Aetna made the tactical decision to hold back until the trial and then argue that Aniero's failure to produce the supporting documents barred its *quantum meruit* claim. That tactic fails because the supporting documents are not essential to Aniero's claim; *see* the discussion in Part II.D.1., *supra,* to which this quotation from *D'Angelo v. State,* 46 A.D.2d 983, 362 N.Y.S.2d 283, 284 (3d Dep't 1974) may be added:

> In its challenge to the award, the State argues that it is unjustified because the claimants failed to keep adequate records of their costs, and hence, the award is improperly based upon the recollection and memory of an interested party, claimant Thomas D'Angelo, as revealed by his oral testimony. We cannot concur in this reasoning. In the first place, it is readily understandable that the trial court would credit the testimony of Mr. D'Angelo, *particularly in the absence of any rebuttal by the State with its vast reservoir of engineering and construction experience....* As to business records supportive of the award, some were introduced, and furthermore, this court earlier determined that the claimants' failure to produce them was not fatal to their case.

(citations omitted) (emphasis added).

I have emphasized a portion of the appellate division's opinion in *D'Angelo* because it indicates that a party defending against a construction *quantum meruit* claim may not with complete confidence offer no proof of its own and rely solely upon a perceived (or misperceived) deficiency in the plaintiff's proof. The appellate division's use of the noun "rebuttal" is striking; it seems to suggest (although the court in *D'Angelo* did not put it quite that way) that proof such as that offered by the claimant in *D'Angelo* and Crevani in the case at bar, if believed by the factfinder, makes out a *prima facie* case of the job cost amounts, subject to rebuttal by the defendant. Such considerations resonate in the instant case, because Aetna offered no evidence that the subcontractors had not performed the work or supplied the materials described in Aniero's claims, or testimony based upon personal inspection, knowledge and belief that the values Aniero ascribed to that work and those materials were excessive;[15] Aetna's defense is

---

**14.** Those original checks were produced by Aniero at trial and received into evidence without objection by Aetna.

**15.** Questioned by the Court on *D'Angelo's* use of the word "rebuttal," counsel for Aetna said during the closing arguments:

> *D'Angelo,* among other reasons, is distinguishable from the Aniero case because we did offer rebuttal through the testimony of Carlos Guerrero that Aniero failed to submit customary industry standard documentation substantiating the value of its claims such as certified payroll records. And, just as significantly, through the evidence that the Court has noted earlier, R–6, which

establishes that Aniero overpaid his subcontractors and therefore the payments themselves do not establish the value of the subcontractors' work, a document which is consistent with Aniero's own judicial pleading regarding Chapman and Evans.... And Mr. Guerrero, I believe, also testified that Aniero was paid more than the value of the work that had been performed on the job.

Tr. A. 76–77.

While Guerrero did indeed testify that Aniero's documentary proof at trial did not measure up to industry standards of completeness, the relevance and probative value of that testimony is limited. Quite apart from Aniero's showing that it submitted to SCA and

based on the proposition that Aniero's proof was insufficient in law. The distinction was made manifest during the closing arguments:

> THE COURT (to Mr. Lepelstat, counsel *for Aetna*). Do you acknowledge that the Promo Pro charges or payments which Aetna does not allow in any amount whatsoever, namely the $1,296,216.77, represents, in part at least, work that was actually done on the Project by Promo Pro and materials actually supplied to the Project by Promo Pro?
>
> MR. LEPELSTAT. I can't say that I do acknowledge that because they haven't established what this work constitutes, what the payments constitute. They have not identified what these payments are for, so it's not my burden to come to Court and testify that this is the value of Promo Pro's work, that's the plaintiff's burden, and the plaintiff hasn't done that.
>
> \* \* \* \* \* \*
>
> THE COURT. But is it your view, with respect to these contractors, whose work is discounted 100 percent by Aetna, didn't perform anything on the project? Didn't do any work, didn't supply any materials?
>
> MR. LEPELSTAT. Your Honor, I don't know if they performed any work on this project or another project. All I know is that Aniero has not substantiated, though documentary evidence or credible testimony, that the value of the work of each of these subcontractors is what Aniero is attempting to recover from Aetna. There are no payroll records, invoices, etc., to substantiate the value of the work of these subcontractors.
>
> \* \* \* \* \* \*
>
> THE COURT. If I buy this defense of yours, then Aetna is required to pay nothing for that work and those materials. Isn't that so? That's the practical consequence of your argument.
>
> MR. LEPELSTAT: Right. And as far as I'm concerned, that's the meaning of the plaintiff's burden of proof.

Tr. A. 71, 73, 74.[16]

This defense is not the stuff of which sanctions for spoliation of evidence are made. Unlike the defendant in *Residential Funding*, whose defense at trial was prejudiced by the plaintiff's failure to make timely production of e-mails requested during pre-trial discovery, Aetna never made a pre-trial application to this Court for a spoliation sanction on the ground that Aniero was prejudicing Aetna's defense by failing to preserve documents relevant to Aetna's defense, whose disclosure Aetna had demanded during pre-trial discovery. On the contrary: Aetna's litigation stance,

KBF supporting documents sufficient to satisfy those Project paymasters, *see* Findings of Fact ¶¶ 14–23 *supra,* and the discussion in text *infra,* Guerrero's opinion regarding the adequacy of Aniero's proof cannot usurp the Court's function in declaring what sort of proof may be sufficient in law to establish a *quantum meruit* claim, or the factfinder's function in determining whether the actual proof adduced was adequate in fact, viewed in the light of the witnesses' credibility. The effect of DX R6 and the document relating to Chapman & Evans, a subcontractor, are discussed in Part II.E.1, *infra.* As for counsel's reference to testimony by Guerrero about the value of the subcontractors' work, the fact is that Guerrero, while fully familiar with the Project, never testified that based upon his personal knowledge of the quality or quantity of the work of a particular subcontractor or subcontractors, the value of that work was less than the amounts Aniero paid. Guerrero based his evaluation solely upon his interpretation of documents in evidence, principally DX R6. *See* discussion in Part II.E.1, *infra.*

**16.** The transcript of the last quoted response of counsel reads "that's the *meeting* of the plaintiff's burden of proof," but it seems clear that counsel said *"meaning."*

explicitly stated in the colloquy between Court and counsel just quoted, is that Aniero's non-production of the subcontractors' supporting documentation *established* Aetna's defense, rather than *prejudiced* it.

In any event, even if one assumes (contrary to Aniero's assertion) that Aniero never produced these supporting documents to Aetna for Aetna's inspection and copying during the lengthy runup to trial, Aetna cannot demonstrate any resulting prejudice to its defense. That is because such documentation was readily available to Aetna from other sources. The requisition and payment process, described in ¶¶ 14–23 of the Findings of Fact, necessarily resulted in SCA, KBF and Aetna itself (though Hudson) coming into possession of the subcontractors' supporting documents, which had to be produced before requisitions could be approved and payments made (by SCA to Aetna and Aetna to Aniero). As Aniero accurately states in its Reply Post–Trial Brief at 50, the testimony of Aniero's witness Crevani and Aetna's witnesses Guerrero and Collins

> confirmed that SCA would not authorize payment unless a contractor's payment request contained certified payrolls and was then reviewed and verified by the construction manager, in this case, KBF. Since four of Aniero's pay requisitions were approved and paid for, the Court can logically conclude that Promo Pro's and every other subcontractor's certified payrolls existed in 1994, and were found sufficient by the SCA and KBF.

Aetna is critical of Aniero's failure to produce at trial a substantial quantity of subcontractors' supporting documents, and scornful of Crevani's proffered excuses: moving the offices, disseminating the files to counsel and other parties during this litigation and litigation with various subcontractors, and a destructive Flood (no refuge is sought in Fire, Pestilence, or Famine). I agree that Aniero would never win a Better Business Bureau award for business records organization and preservation, and the company's shortcomings in that regard placed it at risk in proving its claim against Aetna; *see D'Angelo v. State of New York,* 39 N.Y.2d at 782–83, 385 N.Y.S.2d 284, 350 N.E.2d 615 ("It may well be imprudent and hazardous for the claimant not to maintain detailed business records. He runs the substantial risk that his oral testimony may be disbelieved to a lesser or greater extent and that accordingly his claim may be disallowed in whole or in part for insufficiency of proof. Most claimants would seek to avoid such risks."). However, for the reasons previously stated I reject Aetna's post-trial claim that Aniero's conduct amounted to the spoliation of evidence potentially beneficial to Aetna's defense. I also reject Aetna's contention that Aniero's ability to offer at trial some supporting documents but not others (pejoratively referred to by counsel as "selectively" losing documents, Tr. A. 41) reflects adversely upon Crevani's credibility as a witness.

In sum, for the reasons stated there is no substance to Aetna's arguments that Aniero's failure to call other witnesses or to preserve all the subcontractors' supporting documents require a preclusion of Aniero's claims or the drawing of an adverse inference against Aniero

### 3. Aniero Payroll

In addition to paying its subcontractors, Aniero paid its own officers and employees for work performed on the Project. The amount was stipulated at trial to be $492,673.90, but subject to debate about its allocation and recoverability in *quantum meruit.* Aniero claims that the entire amount should be treated as an actual job cost. The question is considered in Part II.F., fn. 29, *infra.*

### 4. Aniero's Post–December 23, 1994 Payments to S–2 Management and R.J.W. Architecture

██ On December 23, 1994, Aniero ceased working on the Project, left the job site, and fell back upon its Hackensack headquarters. Berdel, the S–2 Management employee who had been Aniero's field superintendent for the Project, and Jennings, the R.J.W. Architecture employee who managed it, *see* Findings of Fact ¶ 13, *supra,* also returned to the Hackensack and continued to work for Aniero., Berdel through February 17, 1995 and Jennings through March 17, 1995. For *their employees' services during the indicated periods,* Aniero paid S–2 Management $3,512.71 and R.J.W. Architecture $13,538.44. Aetna contends that these payments do not constitute "actual job costs" which Aniero can include in its *quantum meruit* claim. I agree.

Aniero argues that "Jennings, along with Berdel, continued to perform services for the Project after Aniero ceased physically working at the Project. Jennings and Berdel set up the computers from the [job site] office trailer in Aniero's Hackensack in order to analyze subcontractors' claims and close out the Project," Aniero's Main Post–Trial Brief at 43, and further, that "[t]heir work was tremendously valuable in defending against the claims which were brought by the subcontractors and assisted in settling the various subcontractor claims"; absent such efforts, "the settlement payment to subcontractors would have undoubtedly been · greater which would, of course, have increased Aniero's job costs and, in turn, its *quantum meruit* claim against Aetna," Reply Brief at 54.

This bootstrap argument does not suffice to bring Berdel's and Jennings's services to Aniero, rendered in order to achieve a number of purposes after Aniero left the job site, within the template of a *quantum meruit* claim for "actual job costs" incurred at the job site and solely in order to complete the Project. As noted in Part II.A., *quantum meruit* is an equitable remedy, awarded when equity and good conscience require a defendant to make restitution. The remedy allows a plaintiff to say to a defendant: "what I have done was for your benefit; you should pay me for it." While I have no doubt that Crevani acted wisely in retaining the services of Berdel and Jennings after Aniero left the job, their services were rendered primarily for Aniero's benefit, specifically in contesting the claims of subcontractors against Aniero. That was made clear during the closing argument by counsel for Aniero, who said of DX R6 (treated at length in Part II.E.1., *infra*):

> Mr. Crevani told the Court what the document represented. It was one in a series of ·charts prepared after Aniero had left the job, put together by a combination of Mr. Jennings, Mr. Berdel, and, to some extent, Emerson.... So, R–6, again, was one in a series of documents or lists, charts that were prepared in an effort to figure out where Aniero was going to stand *vis-a-vis* the subcontractors and their claims.

Tr. A. 10, 12. While Aetna may fairly be regarded as a secondary beneficiary of reductions in subcontractors' claims that Berdel and Jennings helped to achieve, it is too much of a stretch to regard Aniero's payments for those services as part of its "*actual* job costs" incurred in working on the Project.

### 5. Aniero's Payment to the Degmor, Inc.

██ The demolition or renovation of any building of a certain age requires the abatement of asbestos hazards. For the Project, Aniero subcontracted this responsibility to Degmor. Aniero made payments to Degmor, but Degmor claimed it had not been paid enough, particularly

with respect to change orders, and sued Aniero in a New York state court.

At the time Aniero prepared its *quantum meruit* claim against Aetna, and during the trial, briefing, closing arguments, Degmor's suit had not been resolved. Crevani testified at trial that the value "of these change orders would be in the neighborhood of $100,000 or, you know, thereabouts." Tr. 695. In its post-trial briefs, Aniero included that $100,000 estimate in its *quantum meruit* claim. Aetna resisted the claim because at that time Aniero had not paid Degmor that or any addition amount, and the amount of any future payment, Aetna contended, was speculative and unrecoverable.

During the preparation of this Opinion, Aniero asked leave to reopen the record to prove that Aniero had settled Degmor's suit by payment of $150,000. Aniero asked that this amount be added to its *quantum meruit* claim for actual job costs. Over Aetna's objection, I allowed Aniero to reopen the record to introduce documents evidencing the $150,000 settlement payment to Degmor, without prejudice to the parties' contentions about what effect, if any, that amount should have upon Aniero's total claim against Aetna.

I now hold that Aniero is entitled to increase its claim for actual job costs by $100,000. It cannot be gainsaid that Aniero's payment to Degmor compensated Degmor for work performed it on the Project. *Prima facie* that is a recoverable actual job cost incurred by Aniero. But Aniero is entitled to recover only such job costs as are reasonable in amount, and Crevani testified that the reasonable value of Degmor's uncompensated work was $100,000 "or thereabouts," which I interpret to mean "maybe a little more, maybe a little less." The enlarged record does not reveal why Aniero settled the claim for 50% more than Crevani's previously sworn estimate of value. Various factors may enter into why a suit is settled and for what amount. Aetna is not bound by the settlement terms. I decline to disregard Crevani's testimony and accept the $150,000 settlement amount as decisive evidence of the reasonable value of Degmor's work. Instead, I accept Crevani's testimony, and the actual job costs total may be increased by $100,000.

### E. Aetna's Claimed Credits Against Aniero's Actual Job Costs.

**1. Did Aniero Overpay Certain Subcontractors? The Purported Effect of Aetna's Exhibit R–6 and Aniero's Litigation Stance *vis-a-vis* Chapman & Evans**

Aetna contends that Aniero overpaid certain subcontractors in a total amount of $678,856, and claims that amount as a "credit due Aetna" in the *quantum meruit* mathematics. *See* Appendix I to Aetna's Main Post–Trial Brief at 2.[17] Aetna bases

**17.** It is something of a misnomer for Aetna to refer to this amount of asserted overpayments by Aniero to subcontractors as a "credit" to Aetna. Aetna is really saying that the actual job costs component of Aniero's *quantum meruit* claim should be reduced by this amount. However, for the sake of continuity I will adopt Aetna's terminology.

Aniero's briefs characterize this and other "credits" claimed by Aetna as "offsets," and argue that "Aetna has the burden of proof of establishing that it is entitled to any offset." Aniero's Reply Post–Trial Brief at 70. Aniero cites two cases for this proposition: *Banks v.*

*Yokemick,* 177 F.Supp.2d 239, 265 (S.D.N.Y. 2001) and *Van Syckle v. C.L. King & Associates, Inc.,* 822 F.Supp. 98, 102 (N.D.N.Y. 1993). Neither case has anything to do with a construction industry *quantum meruit* claim. *Banks* was a wrongful death action brought under the civil rights statute, 42 U.S.C. § 1983, against a police officer, against whom the jury returned a verdict of $605,000. Defendant invoked the New York setoff statute, General Obligation Law § 15–108, which "governs all tort causes of action," 177 F.Supp.2d at 259, in an effort fully to offset against the jury verdict a $750,000 settlement payment plaintiff's estate received

its contention principally on a document it offered, DX R6, as interpreted by Aetna's Project construction superintendent and expert witness, Carlos Guerrero.

DX R6 is a single-sheet document prepared by Aniero at some unspecified time after it ceased working and left the Project on December 22, 1994. It is titled "Subcontractor Credits due Aniero (re: Payments by SCA)." There are nine columns underneath that title, which I will number for the sake of clarity. Those columns are captioned as follows: (1) "Subcontractor"; (2) "SCA to Aet—Contract Bal. after Req.16"; (3) "SCA to Aet—$ Aetna Paid Req. 17–21"; (4) "% Work Paid For (Work in Place)"; (5) "Aniero Subcontract Price $"; (6) "$ Due Subs (% × Sub Price)"; (7) "Subs Paid to Date"; (8) "Subs Paid to Date for CO";[18] and (9) "Credit due Aniero."

The first column lists in alphabetical order 28 companies that worked on the Project or furnished materials to it. The first of these companies is Aniero itself, with which Aetna contracted, thereby obtaining Aniero's services as the completion contractor. The other 27 companies are subcontractors hired or retained on the job by Aniero.

Before parsing this document further, it will be useful to make further findings of fact with respect to the manner in which contracts are entered into in the construction industry.

The evidence shows that, conceptually at least, a building owner (such as SCA) may enter into two kinds of contracts with a general contractor (such as Carlin or Aniero): a fixed price contract, or a "cost plus" contract. The latter type is inherently less risky for the general contractor, and is thus much loved by contractors with governments. The fixed price contract is more risky for the general contractor because, in order to obtain the job, the contractor must agree to a guaranteed maximum price, or "GMP." This requires the general contractor to enter into contracts with its subcontractors and vendors on terms that will allow the general contractor to complete the project sufficiently below the contract price to cover the general contractor's costs and overhead and turn a profit.

There is one way in which a project will cost the building owner more than the GMP given by the general contractor. That occurs if both parties agree that the contractor (or a subcontractor) will perform work or provide materials covered by "change orders." Conceptually, a change order recognizes that unforeseen and unanticipated conditions have arisen during the work—a spring of water under the foundations, unsuspected infirmities in the building to be renovated, unexpected quan-

from the city and other defendants. The court rejected the setoff, holding that the state statute was inconsistent with § 1983 and therefore inapplicable. In *Van Syckle* investors sued a securities firm under the securities laws, alleging "churning" of their accounts and other fraudulent conduct. At the page of the opinion cited by Aniero, the court held that defendants bore the burden at trial of proving that plaintiffs had failed to act reasonably in mitigating their damages.

Although these cases are factually inapposite, I agree with Aniero in principle that where, as here, a plaintiff in a construction *quantum meruit* case has made a *prima face* showing of actual job costs incurred, and the defendant wishes to reduce the amount of the claim by asserting its right to a "credit," "offset," or "setoff," defendant bears the burden of proving its entitlement by a preponderance of the evidence. I hold that Aetna bears that burden with respect to this and all other credits claimed by Aetna and discussed in Part II.E. of this Opinion.

18. I take "CO" to be an abbreviation for "change orders." See the discussion and further findings of fact in this Part of the opinion.

tities of asbestos which must be removed, the possibilities are legion—which necessitate additional expense not included in the GMP calculus. The leverage that the building owner (such as SCA), advised by its technical representative (such as KBF), has is that the owner must agree to the change order to enable the contractor to charge more for the project than the GMP amount contracted for.

As one can imagine, whether or not a change order should in fairness be agreed to by the building owner frequently gives rise to spirited debates with the general contractor. They may agree that some additional work is clearly required in a Project space or area, but the building owner may be inclined to characterize it as "punch list" work, rather than "change order" work.

"Punch list" work is work called for by the original contract (or subcontract) which the contractor (or subcontractor) has not satisfactorily completed. Change order work increases the compensation paid to contractors or subcontractors. Punch list work does not; the contractor in question must complete the work without further recompense. If a subcontractor encounters a problem within the ambit of its responsibilities that the subcontractor believes justifies a change order, the general contractor must go to bat for the subcontractor with the building owner; if the change order is agreed to, the building owner pays an increased amount to the general contractor, who passes it on to the subcontractor. If the owner refuses to agree to a change order, the subcontractor may press its claim against the general contractor, who, if it pays out, may then seek to recover the amount from the building owner on a breach of contract theory (alleging that the owner wrongfully refused to agree to the change order).

Lastly, and as this case illustrates, subcontractors and material vendors have been known to claim that as the result of changed circumstances or related problems, the general contractor owes them more than their original agreement called for. No less than nine of Aniero's subcontractors and vendors claimed such additional payments, some suing Aniero in state courts to recover them, others filing claims with General Accident, which issued Aniero's performance bond.

I find that it was in these circumstances that Aniero, after leaving the Project, prepared a number of charts, of which DX R6 was one. Another was received in evidence as PX 1263. Crevani testified, and I find, that such documents were prepared by Berdel, Jennings, and Emerson Vidal, Aniero's internal accountant for the Project.

DX R6 is an analysis of the then-existing status of payments under the fixed price contract between Aniero and Aetna, and the fixed price contracts between Aniero and the 27 listed subcontractors. Focusing for the moment on the subcontractors, Column 5 expresses in dollars the "subcontract price," meaning the amount the subcontractor agreed to accept for its work or materials devoted to the Project. Column 4 expresses in percentages the amount of contracted-for work that the subcontractor had completed at the time DX R6 was prepared. Column 6 expresses in dollars the amount corresponding to the completed percentage of the work; as the column caption "% × Sub Price" indicates, the dollar figures in Column 6 are arrived at by multiplying the fixed contract price by the percentage of work completed, as stated in Column 4. Column 7 expresses in dollars the total amount that had actually been paid to the subcontractor at the DX R6 was prepared. Column 9, somewhat misleadingly captioned "Credit Due Aniero," states in dollars the difference between the amounts found in Columns 7

and 6. To illustrate, according to DX R6 the subcontractor called Atlantic Scaffold had a fixed contract price with Aniero of $168,000; 8.65% of its contracted-for work had been completed, which represents $14,529 of the contract price;[19] payments to Atlantic Scaffold at the time totaled $50,677; and the figure appearing in Column 9, $36,148, is the difference between those amounts.

Aetna says that, according to the testimony of Guerrero, DX R6 "shows that Aniero overpaid a majority of its subcontractors on the Project." Aetna Main Post–Trial Brief at 75. Thus, as noted in fn. 15, *supra,* counsel argued in summation that R–6 "establishes that Aniero overpaid his subcontractors and therefore the payments themselves do not establish the value of the subcontractors' work." The amounts of the "overpayments" are derived from the figures appearing in Column 9 of DX R6.

The difficulty with this argument is that DX R6 was not intended to say anything about, and indeed says nothing about, the "value" of the subcontractors' work for *quantum meruit* purposes. It is a document which, for contract purposes, tracks the amounts of work performed and payments made as of a particular date, namely, the date the Aniero staff created DX R6. The following simplified hypothetical may serve to illuminate the distinction. Suppose that I agree to build my neighbor a dog house for the fixed contractual price of $100, to be paid in periodic installments. A time comes when the dog house is 40% completed, but I have been paid $60, instead of $40. The difference between $60 and $40 does not mean that I have been "overpaid" $20, based on the value of my work; it means only that the contract obligates me to perform the remaining 60% of

the work for an additional payment of $40. Such an analysis sheds no light whatsoever on the value of my work, that is to say, the *"meruit"* component of a *quantum meruit* evaluation. Aetna professes to derive meaning in the world of *quantum meruit* from a document prepared for use in the quite different world of contract. But the inhabitants of those different worlds speak different languages, which have different meanings.

Crevani described the distinction during his testimony. DX R6 was received in evidence during cross-examination by counsel for Aetna. Tr. 744. On re-direct examination, counsel for Aniero asked if DX R6 and similar charts were prepared at that time "under a contract view of the world as opposed to a *quantum meruit* view of the world"; Crevani answered in the affirmative. Tr. 746. The distinction caught my attention, and Crevani then testified in response to my questions:

THE COURT: Mr. Agnello [counsel for Aniero] asked you whether or not Exhibit R6 was prepared—I think this was counsel's phrase—under a contract view of the world. Do you remember him using that phrase?

THE WITNESS: Yes.

THE COURT: You said yes, it was, if I heard you correctly.

THE WITNESS: Yes.

THE COURT: Define for me what you meant by a contract view of the world.

THE WITNESS: It was based on their contract. It wasn't considered a *quantum meruit.* Based on their contract, that did not take into consideration based on their contract the change orders that they were doing that we advanced moneys for, based on corrective

---

**19.** Actually, 8.65% of $168,000 is $14,532; the mathematical calculations in DX R6 are not always strictly accurate.

work that they were doing that we advanced moneys for that we were making a claim for. So it was based on that analysis. It wasn't done on the actual *quantum meruit* because we didn't give them credit for any other work they were performing, the change orders, the corrective work. That was just giving them credit for basically the contract value. It has just a couple of items—it doesn't even have the change orders that were approved with the previous contractor. It doesn't have those figures on there. It's missing a tremendous amount of information, documentation. Basically that was done on a contract basis, not *quantum meruit,* not the value of the work they performed.

Tr. 747–48.

The evidence shows that at the time DX R6 was prepared, subcontractors were claiming that they had performed work qualifying as change orders or "corrective work," meaning correcting deficient work of the departed general contractor, Carlin, or Carlin's subcontractors. Subcontractors' contracts with Aniero would entitle them to additional compensation for such work, beyond the contract prices with Aniero. However, the record makes clear that SCA was slow in approving change orders and corrective work. The position Aniero was taking with its subcontractors during those contentious days, as testified to by Crevani, was that "until it's an approved change order, I will assist you in processing it, but until we get an approved change order and we got paid for it, you're not entitled to it based on contractual liability. That was our position." Tr. 748. Aniero prepared DX R6 as a tool, one might even say a weapon, during its difficult dialogue with its subcontractors. The figures appearing on DX R6 have nothing to do with the value of the subcontractors' work, and therefore have nothing to do with Aniero's right to include its payments

to subcontractors as job costs on its *quantum meruit* claim against Aetna.

A comparable analysis applies to the second document Aetna relies upon in support of its argument that Aniero has admitted overpaying subcontractors. This document is PX 911. PX 911 is a pleading filed on July 5, 1995 by Aniero and General Accident in a New York state court, responding to a complaint filed by Sofrock International, Inc. ("Sofrock"). Sofrock was a sub-subcontractor from Chapman & Evans ("C & E"), Aniero's heating, venting and air conditioning ("HVAC") subcontractor. Sofrock contracted with C & E to provide installation of thermal insulation on pipes and ducts at the Project, in consideration of periodic progress payments by C & E. Sofrock quit the job on October 1, 1994 and sued SCA, C & E, Aniero and General Accident, alleging that C & E had not paid Sofrock, in breach of the sub-subcontract. PX 911 is Aniero's and General Accident's answer and crossclaims in that action. The pleading included a crossclaim by Aniero against C & E which alleged that while C & E had completed 52.8% of the work called for by its subcontract with Aniero, Aniero had paid C & E amounts equal to "74% of the of the Line Item [for HVAC] in the Prime Contract [between SCA and Aniero]," so that C & E had been "unjustly enriched" in the amount of $223,042.52. Aetna fastens upon this pleading as a "judicial admission" that Aniero overpaid its subcontractors.

That contention seems to me to suffer from the same defect noted with respect to DX R6. The crossclaim Aniero pleaded against C & E in PX 911 is rooted in the world of contract, although the claim is characterized as one for unjust enrichment. To return to the dog house hypothetical, if at the time postulated I stopped work on the project, my neighbor could

sue me for $20, since I had been paid 60% of the $100 contract price but had completed only 40% of the work. This sort of claim has nothing to do with the value of the work performed, as measured for a *quantum meruit* analysis.

 Thus the relevance of DX R6 and PX 911 to Aniero's *quantum meruit* claim is at best doubtful, given their contractual provenance; and any probative value of these documents pales into insignificance when one considers what sources of directly relevant evidence were available to Aetna but not availed of. Aetna requested Carlos Guerrero to be its construction supervisor at the Project, and, if he was not out of town for another reason, Guerrero was at the Project every day, including some Saturdays, from early April 1994 until after Aniero left the job in December 1994. Tr. 866. Craig Collins, another Aetna witness, was the SCA project officer, "responsible for the construction activities that took place on the Morris High School project." Tr. 783. These individuals were completely aware, on a day to day basis, of the quantity and quality of the work performed and the materials supplied by Aniero's subcontractors. They were also made aware of the amounts Aniero had paid to the subcontractors. Guerrero and Collins were perfectly positioned to rebut Crevani's core contention, that the amounts Aniero paid to the subcontractors did not exceed the value of the work performed or material supplied at the time of the payments. They were perfectly positioned to testify (had they been able to do so truthfully) that Aniero overpaid a subcontractor because its work had not yet been performed or was defective, or the materials had not yet been furnished or were shoddy, or any one of the myriad possible bases for contending

that the payments Aniero made exceeded the value of the work or the materials: in short, that Aniero had overpaid the subcontractors, that being Aetna's core contention.[20] If any adverse inference is to be drawn from an absence of evidence, it arises out of Aetna's total failure to elicit testimony from knowledgeable and competent witnesses such as Guerrero and Collins that, in view of the quantity and quality of particular subcontractors' work or materials, they were in fact overpaid by Aniero. But neither Guerrero or Collins said anything of the kind. The $678,856 Aetna claims as a credit, representing "Overpayments to Aniero Subcontractors," was derived by Guerrero solely from Column 9 in DX R6.

In sum, the documents upon which Aetna relies do not prove that Aniero paid its subcontractors amounts that exceeded the value of the subcontractors' work and materials at the time the payments were made. I will not include in the computation of Aniero's *quantum meruit* claim the $678,856 Aetna claims as a credit against that claim.

### 2. Overpayment to Lazer Electrical Corp.

 Aetna claims as an additional credit an overpayment by Aniero to Lazer Electrical Corp. ("Lazer") in the amount of $238,317.67. *See* Appendix 1 to Aetna's Main Post–Trial Brief at 2.

The evidence shows that Lazer was Aniero's electrical subcontractor. Aniero paid Lazer a total of $728,000 for its work on the Project, the date of Aniero's last check being November 18, 1994. Lazer claimed it was entitled to more, and demanded arbitration with Aniero: a tactical blunder since, as Crevani testified, he be-

---

**20.** Such testimony from Guerrero and Collins would have been a little surprising, since the evidence shows that SCA and KBF continued to retain the services of most of Aniero's subcontractors after Aniero left the Project, including the protean Promo Pro.

96

came aware that after Aniero advanced moneys to Lazer "for the months of October and November and December," SCA and KBF "paid them again for that amount of money," so Lazer "got paid twice for the same amount of work they had performed." Tr. 103–104. In that circumstance, Aniero counterclaimed in the arbitration to recover a portion of its advance payments to Lazer. The arbitrators agreed and made an award directing Lazer to pay about $238,000 to Aniero. Lazer refused to pay the award and dragged out the court proceedings Aniero initiated to collect on it as long as possible. Finally, on August 12, 2000, Aniero collected $238,317.67 from Lazer, representing the judgment entered by a New York state court on the arbitration award. Aniero incurred arbitration costs and attorney's fees and costs during this protracted struggle which, in the absence of any statutory or contractual fee-shifting provisions, reduced its net recovery from Lazer to $106,681.74.

These facts and figures are not in dispute. The parties also agree in principle that Aniero's overpayment recovery from Lazer entitles Aetna to some sort of credit in the calculation of Aniero's *quantum meruit* claim against Aetna. But the parties disagree on how that credit is to be applied in practice. Aniero includes in its actual job costs claimed against Aetna the full $728,000 Aniero paid to Lazer, and then gives Aetna a credit of $106,681.74 (the net amount of Aniero's recovery from Lazer) against statutory pre-judgment interest Aniero calculates on its *quantum meruit* claim from December 22, 1994. Aetna claims a credit of $238,317.67 (the gross amount of Aniero's judgment against Lazer) against Aniero's *quantum meruit* claim itself.

The cases cited by the parties are not in point. The question therefore turns upon the principles of equity and fairness that inform a *quantum meruit* claim. *See* discussion in Part II.A., *supra*. One of those principles is that the claimant in *quantum meruit* is entitled to recover only the reasonable value of the work performed. Counsel for Aniero accepted that proposition during the closing arguments:

MR. AGNELLO [counsel for Aniero]. If in fact someone believed that the value of the work was disparate with respect to the costs, I suppose someone defending against our claim could have put witnesses on the stand to say, well, that's all well and good that you paid the plumbing contractor × amount of dollars, but he only installed one sink, so why would you pay him $100,000?

THE COURT. It seems to me that has to be right, because when you look at the *quantum meruit* formula and the reference to recover actual costs, I think there is an implicit qualifier in there—actual and reasonable costs—it seems to me.

MR. AGNELLO. And I would agree with that, Judge. I think if you are disputing actual costs, you can dispute it on reasonableness.

Tr. A. 94.

This proposition is implicated in the Lazer situation, albeit not directly. Lazer's charges may have been reasonable in amount; the nub of the problem is that SCA and KBF, for reasons not revealed by the record, paid Lazer directly for work covered by advances previously paid by Aniero, rather than routing the payment through Aetna. So it is not a case of Lazer being paid more than its work was reasonably worth; rather, it is a case, as Crevani testified, of Lazer being paid twice for the same work. Nonetheless, it is unreasonable (and hence inequitable) for Aniero to include in its *quantum meruit* claim the full amount of its payments to Lazer, to the extent that such amount

represents a double and unearned payment, unless Aniero gives Aetna a credit sufficient to reflect that overpayment to Lazer. Aniero's approach does not do that. I have no difficulty with Aniero including the full $728,000 payment to Lazer in its compilation of "actual job costs" as part of its *quantum meruit* claim against Aetna; but Aetna is then entitled, as it contends, to a credit of $238,317.67, representing the amount of the overpayment to Lazer as determined by the arbitration award.

I will not accept Aniero's net recovery from Lazer, in the amount of $106,681.74, as the correct measure of the credit due to Aetna. Contrary to Aetna's argument in its briefs, I think that Aniero sufficiently proved the amounts of its arbitration costs and attorney's fees and expenses. But Aniero's approach fails on the merits. In a perfect world Aniero would not have had to pay those fees and expenses, but it is the world's imperfections that keep lawyers (and judges) employed, and so long as our law follows the "American rule" instead of the "English rule," even a prevailing party in litigation must pay its own lawyers, and may not shift them to its defeated adversary. To reduce the credit due to Aetna in the *quantum meruit* calculation by the amount of Aniero's fees, costs and expenses in the Aniero v. Lazer arbitration and litigation would effectively shift responsibility for those payments to Aetna, a non-party, and *a fortiori* a violation of the American rule.[21]

### 3. Asserted Backcharges Against Chapman & Evans ("C & E")

As noted in Part II.E.1, *supra*, Chapman & Evans (or "C & E") was Aniero's HVAC subcontractor on the Project. C & E retained a number of sub-subcontractors to perform parts of the work or supply some of the material that fell within C & E's contractual obligations. One of those sub-subcontractors was Sofrock International, Inc., whose role is described in Part II.E.1. The evidence shows that Aniero paid C & E and Sofrock the total amount of $631,785.48.

I am now concerned with four additional C & E sub-subcontractors: J & J Duct Cleaning, Inc. ("J & J") (a provider, as its name would suggest, of air-conditioning duct-cleaning services); Miller Proctor Nickolas, Inc. ("Miller") (the supplier of materials that C & E required for its work at the Project); Selkirk Metalbestos, Inc. ("Selkirk") (another material supplier); and VR Mechanical, Inc. ("VR") (a supplier of steamfitter labor and additional material). Crevani testified, and I find, that Aniero paid the following amounts to these four companies: J & J, $11,250; Miller, $4,202; Selkirk, $3,798; and VR, $31,272.74.[22] These payments total $50,522.74.

Aetna contends that because Aniero paid these four C & E sub-subcontractors amounts which C & E's contract with Aniero obligated C & E to absorb, Aniero is entitled to "backcharge" C & E for the payments, that is, to deduct them from its own payments to C & E.[23] Because that is

---

**21.** In addition to the conclusions stated in text, I disagree with Aniero that the proper function of the Lazer recovery credit to Aetna is a deduction from pre-judgment interest. The deduction must be from the principal amount of the claim, namely, the total actual job costs recoverable in *quantum meruit*.

**22.** Aniero's Main Post–Trial Brief at 10 incorrectly states that the amount Aniero paid to VR was $31,372.74. In point of fact, the

amount was $31,272.74. *See* Crevani's testimony at Tr. 91.

**23.** Crevani described a "backcharge" at Tr. 695:

That is if a contractor does not perform the work that he is contractually obligated to perform, and after giving him proper notification, ... then what you do is, you charge his account accordingly. Or, if you buy material from him, you would backcharge

so, Aetna's argument continues, Aetna is entitled to a credit of $50,522.74 against Aniero's *quantum meruit* claim.

■ At first blush, it would seem that Aniero's payments to these four sub-sub-contractors for work performed and materials furnished to the Project would be compensable in *quantum meruit* as part of Aniero's actual job costs. But if, as Aetna's argument posits, Aniero coupled these payments to the four sub-subcontractors with payments to C & E covering the same work and materials, there would have been an unreasonable failure on Aniero's part to backcharge C & E for the payments Aniero made to the sub-subcontractors, and Aniero's *quantum meruit* claim against Aetna would have to be reduced (or Aetna given a credit, to use Aetna's terminology) by the total amount in question, $50,522.74.

The difficulty for Aetna is that the evidence does not show that Aniero behaved in so profligate and unreasonable a manner. As noted in Part II.E.1., the disputes between Aniero and C & E took the form of cross-claims that they asserted against each other in the state court action commenced by another sub-subcontractor, Sofrock, against C & E. That litigation was ultimately settled. C & E and Aniero each paid Sofrock $15,000 to settle Sofrock's claim against C & E; but those payments *also* disposed of C & E's substantially larger cross-claim against Aniero, and the backcharges involving J & J, Miller, Selkirk, and VR were factored into the settlement calculus. Thus Crevani testified on cross-examination:

> Q. And the amount paid by [*sic*] J & J Duct from Aniero should be credited

> him, because you paid for material for that contract.

24. When Aetna in its Main Post–Trial Brief at 36 purported to quote this testimony by Crevani, it reproduced only the first sentence of Crevani's answer, "It was at the time we

against Chapman & Evans' account, correct?

A. It was at the time we settled. I took all that into consideration, and it was. It was charged to his [C & E's] account when we made the settlement that I paid $15,000 to his subcontractor [Sofrock] and he paid the other $15,00 to his subcontractor, and that was it, because I took into consideration, with my settlement with him, *all the backcharges.* He was looking for, I don't know, 4, 5, hundred thousand dollars more, over and above what I paid him plus what the SCA paid him for the value of work that he performed during my tenure. And I deducted ultimately, *I deducted those backcharges,* and his 4, 5, hundred thousand dollar claim was reduced to me paying his sub $15,000.

Tr. 698–99 (emphasis added).[24]

Crevani's testimony on this point was never challenged. It establishes that Aniero did not pay C & E as well as the four sub-subcontractors for the latter's work. Aniero, having paid the subcontractors, "backcharged" C & E for those payments in a practical manner, by whittling the six-figure amount C & E sought from Aniero in its cross-claim in the Sofrock litigation down to the $15,000 contribution Aniero paid to Sofrock to settle the case. Accordingly I conclude that Aetna has failed to prove the factual premise for its claimed backcharge credit. That credit will not be allowed.

### 4. "Punch List" Work

At the trial, Aetna's witnesses testified that Aniero had failed to perform "punch

settled," and omitted the detailed explanation which immediately followed. Aetna indicated by the use of an ellipsis that something had been left out, but this sort of selective and edited quotation sails a bit too close to ethical reefs.

list" work with a total value of $889,396.28. Aetna's initial position was that Aniero's *quantum meruit* claim had to be reduced by that amount. In Appendix 1 to its Main Post–Trial Brief, Aetna reduced that amount by what it refers to as "Credit for Defective Work Corrected by Aniero Subcontractors," namely Lazer, C & E and American Standard. The net punch list credit Aetna now seeks against Aniero's claim is $684,850.78.

Before considering the evidence on the subject, it is necessary to define the term "punch list." Collins testified that "[a] punch list is defective work or uncompleted work performed by a contractor on a project." Tr. 784. Guerrero gave a more detailed definition at his pre-trial deposition:

> A punch list, let me start before that. Acceptance of a phase when a project is phased like this one, that each is going to be accepted on its own value, acceptance of a phase or a project signifies that the work has been done to allow the owner to occupy that phase or that project for his intended purposes. And the only thing that is left is minor punch list items. A punch list is not intended to be a major list of deficiencies. It is intended to be like if there is a little chip in the paint on the wall behind you, the corner bead here sticking out a little too far, things of that nature, minor. That is what a punch list is. This is done immediately after the acceptance of a phase or project.

Tr. 1108. That deposition testimony forms a part of the trial record because counsel for Aniero read it to Guerrero on cross-

examination, and Guerrero acknowledged its truthfulness. Tr. 1109.[25]

To reiterate a point previously made, when a contractor or subcontractor is working pursuant to a fixed price contract, there is a fundamental difference between work performed under a change order and work performed to complete a punch list. Because a change order reflects the agreement of the owner and the contractor that unforeseen circumstances necessitated additional or different work to complete the project, the contractor receives compensation in addition to the previously guaranteed maximum price. But a punch list reflects contracted-for work that is incomplete or defective. The contractor must attend to punch list items without additional compensation, and if it fails to do so, the building owner may correct the work and backcharge the contractor for its cost. Thus Guerrero testified:

> If the subcontractors do their own punch list work, then there is no deduction. If the owner—by that I mean the owner and his team, construction managers, whatever—if they do the corrective work, than that becomes a valid back charge against the general contractor.

Tr. 956. Because of these economic considerations, owners and contractors frequently quarrel about whether particular items should be regarded as change order work or punch list work. That happened in this case.

 The evidence shows that after Aniero quit the Project in December 1994, the SCA severed its relations with Aetna as well and, with the assistance of KBF, arranged for the completion of the Project

---

**25.** The etymology of the phrase "punch list" is obscure. I asked Guerrero where the phrase came from, and he said: "It's a very old term in the construction industry, and I really cannot answer because I really don't know." I suggested that in a less civilized time, a building owner might say to a contractor: "You fix this up or I will punch you out"; Guerrero responded that "[i]t wouldn't surprise me if that was real reason." Tr. 946–47.

and undertook paying for it. I accept in principle that Aetna is entitled to a credit against Aniero's *quantum meruit* claim for any costs incurred in completing or repairing any uncompleted or defective punch list work for which Aniero was responsible during its tenure as the replacement general contractor, notwithstanding that SCA rather than Aetna paid those costs. To the extent that a contractor's work is uncompleted or defective, it reflects adversely upon the value of the work, which is the touchstone of a *quantum meruit* claim; and costs incurred by another, whoever it may be, to put the work right are appropriately deducted from that claim.

In the case at bar, Aniero would bear responsibility for incomplete or defective work performed by Aniero itself or by an Aniero subcontractor. Aetna would be entitled to a credit against Aniero's *quantum meruit* claim if Aetna carried its burden of proving that SCA paid particular amounts for the completion or correction of punch list work for which Aniero was responsible, either directly or by reason of one of its subcontractors' deficient performance. I turn to the trial evidence.

Craig Collins, SCA's chief officer for the Project, testified concerning the costs incurred by SCA to attend to punch list items. Through his testimony Aetna introduced DX U19, DX H3, and DX A.

DX U19 an 11–page collection of letters sent by Collins to Aetna and Aniero in October, November, and December 1994, enclosing punch lists. Collins testified on direct examination that these punch lists were prepared "regarding Aniero's work." Tr. 784. Collins's letter to Aetna and Aniero states that in view of their failure "to complete the punchlist work for the earlier phases of construction on this project," SCA was exercising its contractual

right "to have the subject work performed by an outside contractor, effective immediately." [26]

DX H3, a 12–page document, was identified by Collins as "a punch list of defective and incomplete work in the phase areas for Morris High School, the phase areas done by Aniero." Tr. 787. The phrase "phase areas" reflects the fact that the basement-to-roof renovation of the High School was separated into a number of construction phases, some but not all of which Aniero dealt with as replacement contractor. DX H3 bears a date of May 17, 1995 and a "rev. date" of June 1, 1995. Collins testified that the punch list items contained on H3 were items that Aniero had previously performed work upon; that Aniero never completed any of the punch list work set forth in DX U19 or DX H3; and that the punch list work was performed by another contractor retained by SCA after Aniero left the project. Tr. 789.

DX A, a 91–page document, was identified by Collins as "Requisition 131 on the Morris High School Project." Tr. 790. The requisition is dated May 22, 2002. It was submitted by KBF to SCA, which approved and paid it. Tr. 790. Aetna's purpose in offering the exhibit was "to establish the amounts that the SCA paid to have the punch list items attended to." *Id.* Using DX A to refresh his recollection, Collins testified that "the amount of money expended by the SCA to complete Aniero's punch list work" was "roughly $880,000." Tr. 791–92. Collins derived that total from page 12 of DX A, designated "Aetna A–0012." That page is a summary of the work and materials covered by Requisition 131. Under the caption "Additional Service Since 01/11/95," three items and amounts are included: "Punch List Work,"

**26.** The documents introduced through Collins's testimony refer to "punchlist" work, rather than the two-word designation, "punch list," which appears in the trial transcript and the briefs of counsel. I will follow the format of the transcript and the briefs.

$19,204.47; "Punch List Work—Subs," $796,639.28; and "Punch List Labor," $73,552.53. These amounts total $889,396.28, which corresponds to the "roughly $880,000" to which Collins testified. Aetna's initial litigation position was that this entire amount should be credited to it against Aniero's *quantum meruit* claim.

Guerrero, Aetna's other witness, was in court and heard Collins's testimony about Project punch lists. However, since Guerrero acknowledged that "I have not seen the punch list" counsel presented to Collins during the latter's testimony, Tr. 955, Guerrero's testimony on the subject was limited to the generalities that I have previously quoted.

Thus the validity of Aetna's claimed punch list credit stands or falls upon whether Aetna has proved that the SCA incurred costs in an ascertainable amount to complete or rectify uncompleted or deficient work performed by Aniero or an Aniero subcontractor between March and December, 1994, that being the period of Aniero's tenure as the replacement general contractor. Aetna bears that burden of proof, whether the amount in question is the $889,396.28 initially testified to by Collins, or the reduced amount of $684,850.78 now claimed by Aetna in the appendix to its brief. *See* fn. 29, *infra.*

Aetna did not carry that burden. Collins conceded during cross-examination that he lacked sufficient personal knowledge to allocate this entire amount to punch list work for which Aniero was responsible, and in any event the weight of the evidence points in the opposite direction. To understand those factors fully, it is necessary to describe further the troubled history of this Project.

Collins testified on cross-examination, and I find, that after Aniero left the job in December 1994, a number of the subcontractors Aniero had retained were then engaged in various aspects of their contracted-for work which had not been completed. Collins, on behalf of SCA, sent letters to each such subcontractor, taking the position that "the Aniero subcontractors had an obligation to complete the work for the balances remaining in the Aniero subcontracts"; those letters went to the subcontractors for "electrical, plumbing, HVAC, Chapman & Evans, all the major trades"; and, without exception, "[e]very one of Aniero's subcontractors took the position that they were owed a lot of money for contract work and extra work that they had performed on the project." Tr. 799–800.[27] Nor was this merely posturing on the part of the subcontractors. The SCA and KBF assessed the state of the work and the payments previously made to subcontractors and, as Collins acknowledged, they agreed that the subcontractors "were owed money." Tr. 800. Indeed, in a "Decision Paper" dated January 12, 1995 that Collins sent to other SCA officials, he wrote: "Existing subcontractors are owed *a lot of money* for contract work and change orders they have completed." PX 1251 (emphasis added).

Following Aniero's departure from the Project, the SCA, through KBF, rehired many subcontractors, vendors, suppliers and materialmen who had worked for Aniero. Aniero's Main Post–Trial Brief at 49–50 sets forth a list, derived from the evidence, of the 17 rehired companies and the millions of dollars the SCA paid them. By way of illustration, after Aniero departed the SCA paid Promo Pro $3,022,642, Lazer $2,394,035, and C & E $486,419. In

27. The quotations in text are taken from cross-examining counsel's questions, but Collins adopted the substance of counsel's ques- tions as part of his testimony by agreeing with each of them.

addition, the evidence shows that the SCA paid Aniero subcontractors a total of $962,100 for work they performed at the Project during the months of November and December 1994, while they were still working for Aniero. That significant sum is consistent with Collins's acknowledgment that the Aniero subcontractors were owed "a lot of money" at the time Aniero left the Project.

It is important to note that, as acknowledged by Collins in his testimony, none of these payments by SCA to an Aniero subcontractor could have been for punch list work ascribable to that subcontractor. That is because, as previously noted, a contractor or subcontractor is required to attend to its own punch list work without further compensation by the building owner; until the punch list work is satisfactorily completed, the owner has not received the work for which he contracted to pay and the contractor has not performed the work he contracted to perform. Thus Collins testified on cross-examination:

Q. Because the SCA will not pay a general contractor or its subcontractors for performing work that's defective or not in accordance with the specifications, correct?

A. That's correct.

Q. Because the subcontractors or the general contractor has an obligation to install in accordance with the specifications, correct?

A. Yes.

Q. So you would not pay a contractor additional moneys to correct its own deficient work, correct?

A. That's correct.

Tr. 798.

Accordingly, any payments by SCA to a *particular* subcontractor to perform "punch list work" would necessarily have been for the completion or remedying of the deficient work of *a different* subcontractor. Collins made that plain, taking Lazer, Aniero's electrical subcontractor which the SCA rehired; he testified:

Q. [by counsel for Aniero, cross-examining] You also reached an agreement with Aniero subcontractors, in this case Lazer, if they performed work not in accordance with the contract documents, the specifications, their own work, that they would repair it for no extra cost, correct?

A. Yes.

Q. That's just normal, that's their obligation anyway, isn't it?

A. Yes.

Q. Because, as we discussed earlier, you wouldn't pay them to correct their own defective work, correct?

A. Yes.

Q. So at least we can agree as to moneys paid for punch list work to Aniero subcontractors, that was not punch list work for the work Aniero subcontractors installed, it was for work someone else had not installed correctly, correct? At least as to Aniero's subs?

A. Yeah, I guess you could say that.[28]

Tr. 811–12.

This crucial distinction, between a contractor doing punch list work necessitated by its own deficient performance and doing

---

28. SCA's payments to former Aniero subcontractors can be ascribed to deficient or incomplete work *of those subcontractors* only if one assumes that Collins violated his own procedures, unequivocally described in his testimony, and paid Aniero subcontractors to correct defects which the subcontractors should have corrected without further compensation. There is no basis in the evidence for believing that Collins, an experienced construction manager, would disregard his own standards.

punch list work necessitated by the deficient performance of a different subcontractor, comes into sharp focus when one examines the letter dated January 31, 1995 Collins signed and sent to Lazer. That letter, PX 1252, refers to a January 23 meeting discussing resumption of work by Lazer on the Project, and summarizes "the understanding that all the following conditions are met on behalf of the SCA and Lazer Electrical:" Specific "bullet points" are then set out. I will quote the last two:

> \* Lazer will complete all punchlist work under their responsibility during non-school hours at no cost to SCA/KBF.
>
> \* Lazer will perform all other punchlist work during non-school hours on a time & material basis. The SCA costs for this work shall be back charged to the contractors responsible for the work performed.

These provisions are consistent with all the evidence about punch list work. A contractor must complete at no cost to the building owner punch list work "under [its] responsibility," but it may charge the owner for "all other punchlist work," that is, work performed by others, leaving it to the owner to seek to recover the cost from "the contractors responsible for the cost." While these illustrations have focused upon Lazer, there is no reason to suppose that the SCA followed a different course with the other major subcontractors; certainly there is no evidence that it did.[29]

With respect to the Project in suit, one might ask what other contractors could have been responsible for the punch list work a rehired SCA subcontractor like Lazer corrected "on a time & material basis," to again quote PX 1252, A name comes readily to mind: Carlin, the disgraced, defaulted and disappeared initial general contractor, which, the evidence shows, retained important subcontractors other than those retained by Aniero. One may reasonably question the competence of the Carlin subcontractors who departed with Carlin, being replaced by Aniero subcontractors such as Promo Pro. In any event, what the evidence makes clear is that the Aniero subcontractors rehired by the SCA, like Lazer, could be engaged in remedying punch list work necessitated by the deficient performance of a host of prior, Carlin-related subcontractors, not to mention the deficient performance of Carlin itself.

In these circumstances, it is clear that Aetna does bear its burden of proof on the punch list credit issue by simply having Collins recite the three punch list items and amounts that appear on page A-0012 of DX A, KBF's Requisition 131. The largest of these three items says only: "Punch List Work—Subs," followed by the amount of $796,639.28. It appears from that page of the exhibit that this work was performed "since 01/11/95," which means that it was performed by SCA-rehired subcontractors, rather than by subcontractors still under contract to Aniero. But what the document does not show is who was responsible for the punch list work that had to be done; the other two punch list items on page A-0012, with lesser amounts, are equally uninformative. Nor was Collins in a position to supply that vital link in the chain of evidence Aetna is required to forge to obtain its claimed credit; he testified:

> Q. [by Aniero's counsel, cross-examining] Mr. Collins, as you sit here today, can you tell me how much of the $880,000 you testified to about the punch

---

**29.** Collins also testified that, with respect to the $962,100 which the SCA paid to Aniero's subcontractors during November and December 1994, before SCA rehired them, those payments would not have included anything for subcontractors to remedy their own defective work. Tr. 802–03.

list was paid to Aniero's subcontractors for correcting their own work installed during Aniero's tenure?

A. I couldn't tell you that.

Q. You can't tell me?

A. No.

Q. So you can't tell me the reverse, which would be the component that was paid to subcontractors to correct Carlin installed work, right?

A. No.

THE COURT. Do you agree that the $800,000 figure is made up, in whatever proportion, of two components with respect to subcontractors, that is, punch list payments to subcontractors for work that fell within the Aniero contract, but also some punch list money paid to subcontractors for work arising out of the Carlin contract?

THE WITNESS: Yes.

THE COURT: You do accept that that is true?

THE WITNESS. Yes.

Tr. 816–17.

The most that can be said for Aetna's proof on this issue is that SCA paid considerable sums for punch list work on the Project; but there is a failure of proof as to what portion of those sums, if any, was expended to perform punch list work that fell within Aniero's sphere of responsibility. That failure of proof is fatal to Aetna's claimed credit for punch list work, for it leads the factfinder into impermissible speculation and conjecture. The credit will not be allowed.[30]

### 5. Offsite Materials Advanced by Aetna

■ Aetna claims a credit of $637,552.92 against Aniero's *quantum meruit* claim, based upon "Aniero's Agreement to Reimburse for Offsite Materials Advanced by Aetna." Appendix 1 to Aetna's Main Post–Trial Brief. Aniero disputes that credit. To consider the issue, it is first necessary to understand what is meant by the phrase "offsite materials."

The basement-to-roof renovation of a high school building requires considerable amounts of materials. When Carlin, the initial general contractor, defaulted and ceased work at the Project, a number of its subcontractors, vendors and materialmen had on hand construction materials of various kinds intended for use on the Project which they were holding "offsite," that is to say, at their premises and not at the Project site. Aniero, having contracted with Aetna to be the replacement general contractor, needed those materials, just as Carlin had needed them. The companies holding the materials, understandably enough in view of Carlin's default, demanded that they be paid for them before they delivered the materials to the Project.

Under its contract with Aetna, Aniero was obligated to pay for materials used on the Project. But Aniero asked Aetna to advance the funds necessary to obtain the

**30.** In its post-trial briefs, Aetna retreated from its initial claimed punch list credit of $889,396.28. Perforce accepting the testimony of Collins, its own witness, that Aniero subcontractors "would not have been paid to correct their own defective work," Main Post–Trial Brief at 42, Aetna deducted from its claimed punch list credit $204,545.50, that being the total of payments SCA made to three subcontractors, Lazer, and C & E, and American Standard, as evidenced by Aniero Exhibits 1253, 1254, and 1255. Appendix 1 to Aetna's Main Post–Trial Brief characterizes these payments as "credit for defective work corrected by Aniero subcontractors," a description which I find somewhat obscure. The effect of this deduction is to reduce Aetna's claimed punch line work credit from $889,396.28 to $684,850.78, which it now claims. I do not see that this tailoring of the claim cures in any way the failure of proof discussed in text, and so disallow the punch list credit in its entirety.

release of these offsite materials, on the understanding that Aniero would deduct those amounts from the payment requisitions Aniero would submit to Aetna under the contract between them.

Aetna agreed to this procedure. The agreement is reflected in a number of exhibits in evidence. On some occasions, with respect to a payment by Aetna to a particular subcontractor or vendor, Guerrero on behalf of Aetna would send a letter to Crevani reciting the understanding, which Crevani would countersign on behalf of Aniero, indicating Aniero's agreement. On other occasions, Crevani would send a letter to Guerrero which Guerrero would countersign. An example of the first approach is found in DX 16, a letter dated May 16, 1994 from Guerrero to Crevani, which refers to elevator equipment worth $24,448.48 being held by a company called Roma Elevator. The letter states in part:

> It is our understanding that Aniero Concrete authorizes The Aetna Casualty and Surety Company to pay Roma Elevator for all elevator material and equipment stored off site, and that Aniero Concrete authorizes The Aetna Casualty and Surety Company to deduct the cost of this material and equipment from Aniero's first pay requisition on the Morris High School project.

Crevani countersigned the letter on behalf of Aniero as "agreed to and accepted." DX H7 provides an example of the second approach. It is a letter dated June 21, 1994 from Crevani to Guerrero, which refers to door, frame and molding materials worth $99,279.74 being held by a company called Jet Resources. The letter states in part:

> Aniero will agree and accept that Aetna will deduct the total of $99,279.74 from Aniero pay request from monies paid by the N.Y.S.C.A. to Aetna as a result of

Aniero's billing to the N.Y.C.S.C.A. for the work/material in the above invoices.

Guerrero countersigned the letter on behalf of Aetna as "agreed to and accepted." During his trial testimony Guerrero described each of these payments made by Aetna to release materials subsequently used by Aniero on the Project, and testified (and I find) that they totaled $637,552.92. This is the credit Aetna claims against Aniero's *quantum meruit* claim.

I hold that, within the context of a *quantum meruit* claim, Aetna is not entitled to claim this credit.

Aniero entered into these side agreements with Aetna when the rights and obligations of Aniero and Aetna were governed by the contract between them. Under that contract, Aniero was obligated to obtain at its expense the materials it would use to complete the Project. Accordingly, when Aetna advanced the funds to release the materials in question to Aniero for the latter's use, Aetna was acting in effect as a vendor of materials to Aniero. Rather than paying Aetna for these materials at the time, as it would the usual vendor, Aniero and Aetna entered into the sensible arrangement whereby Aniero would allow Aetna to deduct the cost of the materials from payment requisitions Aniero sent to Aetna under the contract. If subsequently Aniero had claimed payments of its contract requisitions in full, without allowing deductions for Aetna's funding these materials (although these is no indication that Crevani would have taken that position), Aetna could rely upon the side agreements and insist upon the deductions from payments otherwise owing to Aniero under the contract.

These contractual economics may be further explicated by returning to the hypothetical dog house I agreed to build for my neighbor at a contracted-for price of $100.

In agreeing to that price, I calculated that I would have to purchase wood worth $20, a cost that, together with the cost of other materials and the value of my time, would still leave me with a profit. However, it happens that my neighbor has in his garage $20 worth of wood, which he makes available to me to use in constructing the dog house. My neighbor could reasonably ask me to reduce the contract price by $20, and I could reasonably agree to that side agreement; it leaves my profit margin unchanged. In essence, this is what Aniero and Aetna agreed to with respect to the offsite materials.

But it is crystal clear that such agreements, rooted in the original contractual relationship between Aniero and Aetna, have nothing to do with Aniero's present *quantum meruit* claim against Aetna. When this Court held that no contract existed between Aniero and Aetna, that supposed contractual world, in which the materials side agreements lived and moved and had their being, vanished in the twinkling of an eye, taking the side agreements with it. Aniero's claim now perforce sounds in *quantum meruit*. In that quite different context, Aetna would be entitled to a credit for the costs of these offsite materials only if Aniero had included them in its computation of actual job costs, a recoverable component of a *quantum meruit* claim. Aetna could then offset those claimed costs by the amounts it had paid for the same materials. But Aniero did not include the costs of the offsite materials in its compilation of its own "actual job costs." It follows that while Aetna would have been entitled under the side agreements to deduct the costs of the offsite materials from a claim Aniero might have asserted under the contract, Aniero's entirely proper decision to exclude from its "actual job costs" the costs of materials for which it never paid deprives Aetna of any basis for claiming a credit with respect to those costs which would serve to reduce

Aniero's *quantum meruit* claim. Therefore the claimed credit will not be allowed.

### F. Aniero's Claim for Overhead and Profit

■ Aniero includes in its *quantum meruit* claim against Aetna a claim for overhead and profit. It calculates overhead and profit in the aggregate on the basis of 15% of the actual job costs incurred on the Project. Aniero makes no effort to break down that 15% factor between overhead and profit. Aetna contends that Aniero's proof is insufficient to sustain a claim for either overhead or profits.

On this subject, I have had a prior occasion in this case to say:

> Under a *quantum meruit* claim, a party may "recover its actual job costs for work, labor and services performed and material furnished, plus an allowance for overhead and profit." *Maris Equip. v. Morganti, Inc.*, 163 F.Supp.2d 174, 186 (E.D.N.Y.2001). *Quantum meruit* damages must be "based upon 'a definite and logical connection between what is proven and the damages sought to be recovered' and cannot be speculative or conjectural." *Clifford R. Gray, Inc. v. State*, 251 A.D.2d 728, 674 N.Y.S.2d 440, 442 (3d Dep't 1998) (citations omitted). Although overhead and profit may sometimes be established as a percentage above direct costs, courts may require specific evidence of overhead and profit. *Maris Equipment*, 163 F.Supp.2d at 191–92.

*Aniero Concrete Co., Inc. v. Aetna Cas. and Sur. Co.* No. 94 Civ. 9111, 2002 WL 31410641, at *1 (S.D.N.Y. Oct. 25, 2003). The questions that arise with respect to Aniero's claim for overhead and profit are whether this is an appropriate case for establishing the claim "as a percentage above direct costs" (as Aniero seeks to do),

and whether the 15% claimed is reasonable, rather than speculative or conjectural.

With respect to lost profits, in *Merlite Industries, Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir.1993), the Second Circuit, construing New York law, said:

> Courts addressing the issue of damages based on lost profits have distinguished between established businesses and fledgling businesses, allowing the claims of the former to be supported by evidence of past performance. *See, e.g., Greasy Spoon Inc. v. Jefferson Towers, Inc.*, 75 N.Y.2d 792, 795–96, 552 N.Y.S.2d 92, 551 N.E.2d 585 (1990). An established business often is in a good position to offer evidence of past experience as a reasonable basis from which a jury may determine lost profits with the requisite degree of certainty.

In *Greasy Spoon*, cited and followed by the Second Circuit in *Merlite*, the New York Court of Appeals upheld a jury award for loss of profits involving a sidewalk cafe. The Court, distinguishing an earlier case "where lost profits from a municipality's decision not to construct a stadium were denied because there were too many undetermined variables," went on to reason:

> [I]n this case, most of the variables that that would affect the success of the thwarted business venture, i.e., location, capitalization and existing or potential clientele, were established through competent proof. Thus, the evidence at trial was sufficient to remove plaintiff's lost profit claim from the realm of impermissible speculation.

75 N.Y.2d at 795–96, 552 N.Y.S.2d 92, 551 N.E.2d 585. In stressing the ability of an established business to rely upon its past performance, there is no principled difference between quantifying overhead and profits.

This principle resonates in the case at bar because Crevani is an experienced executive of established businesses in the construction industry. He testified, and I find, that he was 60 years old at the time of trial. I find further that from 1970 to 1995, Crevani was an executive with Aniero, which was a general contractor and a developer. During those 25 years Crevani oversaw all aspects of the business. He gave estimates, supervised jobs, worked on sites, worked in the main office, and "basically oversaw every aspect of Aniero." Tr. 32. The majority of his time was spent on job sites. Since 1995 Crevani has been employed by Forsa Construction, his son's business, as a consultant to plan, organize, and carry out construction jobs.

Based upon this experience, Crevani testified that on a job of the "extent and magnitude" of the Morris High School project, he would "expect to receive 15 percent overhead and profit." Tr. 573. Aetna characterizes this as a baseless expectation and that Aniero's proof in support of its claimed 15% increment over actual job costs for overhead and profit is insufficient in law. But the law does not require that an established construction business calculate overhead and profit claims with precision and support them by detailed proof. Courts recognize that, unlike specific job costs, overhead and profit are not susceptible to definite and particular documentation and calculation. *See, e.g., U.S. ex rel. Maris Equipment Co., Inc. v. Morganti, Inc.*, 163 F.Supp.2d 174, 187 (E.D.N.Y.2001) ("overhead and profit ... by their very nature they are not susceptible to precise calculation"). That their recovery should be calculated according to a percentage of job expenses is, thus, only reasonable. *See Manshul Const. Corp. v. Dormitory Authority of New York*, 79 A.D.2d 383, 436 N.Y.S.2d 724, 730 (1st Dep't 1981) ("A percentage above direct costs has frequently been al-

lowed for overhead and profit in allocating compensation on a *quantum meruit* basis in construction contract cases ... This application of an arbitrary figure has been accepted in a series of cases arising from a construction contract in the absence of proof of a mathematical basis for computing damages.") (citations omitted).

Nor is a claim of 15% of costs to cover overhead and profits combined unreasonable as a matter of law. On the contrary: recoveries of that dimension have been approved by numerous cases decided by courts in this Circuit and by New York courts. *See, e.g., Manshul Const. Corp. v. Dormitory Authority of New York,* 79 A.D.2d 383, 436 N.Y.S.2d 724, 730 (1st Dep't 1981) (recognizing reasonableness of a 15% addition to claim to account for overhead and profit); *U.S. for use of Tower Masonry, Inc. v. J. Kokolakis Contracting, Inc.,* No. 93 Civ. 6369, 1995 WL 539742, at *5 (S.D.N.Y. Sept. 8, 1995) ("These costs include a 10% add-on for overhead and 10% for profit, percentages which the Court finds to be normal and reasonable."); *Westcott v. State,* 264 A.D. 463, 36 N.Y.S.2d 23 (3d Dep't 1942) (15% of costs to cover profit and overhead

deemed reasonable despite lack of specific accounting); *Fehlhaber Corp. v. State,* 69 A.D.2d 362, 419 N.Y.S.2d 773, 778 (3d Dep't 1979) (11.22% of costs to cover profits and overhead was found to be reasonable); *D'Angelo v. State,* 41 A.D.2d 77, 341 N.Y.S.2d 84, 88 (3d Dep't 1973) (recognizing a 10% addition to a *quantum meruit* claim to account for "overhead and profit."). *Cf. Clifford R. Gray, Inc. v. State,* 251 A.D.2d 728, 674 N.Y.S.2d 440, 442 (3d Dep't 1998) (20%–27% addition for profit and overhead was not reasonable).

Moreover, Crevani gave considerable trial testimony in support of Aniero's claim for overhead. He recited an extensive and plausible list of costs constituting Aniero's standing overhead during the period the company worked on the Project. He also testified that the Project made use of those standing facilities, including construction vehicles, Aniero's construction yard, and the clerical, managerial and secretarial services of Aniero employees. Tr. 575–78.[31]

Crevani did not undertake to allocate the 15% figure between overhead and profit. Aetna is critical of that failure, and

---

**31.** Salaries of Aniero employees, other than Crevani himself, during the relevant period cannot be factored into an overhead allowance because Aniero's payroll expenses are claimed separately as actual job costs. *See* Appendix A to Aniero's Main Post–Trial Brief at 5, which lists as a job cost "Aniero Concrete Payroll" in the amount of $492,673.90. That total is derived from Court Exhibit 3, which recites in ¶ 2 the parties' stipulation that during the period May 12, 1994 through December 22, 1994 (the period Aniero worked on the Project) Crevani's salary and related employer payroll tax obligations totaled $142,617.12, and in ¶ 1 that in respect of all other employees, Aniero's payroll payments and related tax obligations totaled $350,056.78. The stipulation, Court Exhibit 3, recites at ¶ 3 that "Aetna does not concede the value, appropriateness or allocation of the amounts set forth in paragraphs 1 and 2 as

Aniero's payroll costs for the Morris High School project."

In that regard, I accept Guerrero's testimony, contradicted only by a conclusory argument in Aniero's Post–Trial Reply Brief at ·59, that "[t]he salaries of executives of a construction company [like Crevani] are considered to be overhead, costs for that construction company," Tr. 957, as opposed to specific job costs. It follows that Aniero's job cost total must be reduced by $142,617.12, the amount of Crevani's salary and related taxes; however, this is something of a two-edged sword, since Aetna, by successfully moving this sum from job costs to overhead, furnishes Aniero with proof of an overhead item of significant amount. In addition, Crevani's testimony establishes the existence of a number of other expenses properly taken into account in considering a percentage allowance for overhead.

argues that it demonstrates that the claimed overhead and profit are both speculative. I do not agree. As Crevani testified, his business practice was to add 15% of costs to his contracts to account for both overhead and profit. Tr. 574–575, 579. There was not, according to his testimony, a standing division of this 15% between profit and overhead. *Id.* Rather, he testified, the company would pay its bills and whatever was left constituted profit. This is a perfectly reasonable approach, specifically approved by the New York construction *quantum meruit* cases cited and quoted *supra.*

Aetna contends that Aniero has failed to prove any entitlement to either overhead or profit, relying principally upon *United States ex rel. Maris Equipment Company, Inc. v. Morganti, Inc.,* 163 F.Supp.2d 174 (E.D.N.Y.2001) or, alternatively, that the 15% figure is too high, relying principally upon the opinion testimony of Guerrero.

*Maris* pitted a plaintiff subcontractor against a contractor and its surety in a Miller Act case arising out of the installation of cells in a new federal detention center. The case was tried to a jury, which on the plaintiff's subcontractor's *quantum meruit* claim awarded the subcontractor $6,576, 997 for its direct job costs, $712,126 for profit, and $712,126 for overhead. Maris, the plaintiff, had asked the jury to include in its damages awards 10% of plaintiff's costs for profit and an additional 10% for overhead, requests with which the jury essentially complied (although apparently basing the percentages upon a slightly higher job costs figure). The defendant contractor moved for post-verdict relief under Rules 50(b) and 59(a), arguing *inter alia* that "there is no evidence for [the profit and overhead] awards." 163 F.Supp. at 187. District Judge Block had instructed the jury that damages for overhead and profit need not "be established with absolute certainty

since by their very nature they are not susceptible to precise calculation," adding that "[a]ll damages which you may award must simply be reasonable under all the circumstances." 163 F.Supp. at 187. These instructions followed New York case law; many of the New York cases Judge Block cites, *id.* at 187–88, I have cited *supra.*

As for profit, the Court reviewed the evidence and concluded "that it is sufficient to support an award for profits, but it cannot support the magnitude of the jury's verdict." 163 F.Supp. at 191. Judge Block noted that a "project report" stated that the plaintiff "anticipated a profit of not more than 6.4%," and held that other evidence in the record was "not of sufficient weight to warrant a profit award in excess" of that 6.4 percentage. 163 F.Supp. at 191.

As for overhead, Judge Block concluded that "there is simply no evidence before the Court that can support any award for overhead." He reasoned:

> As noted, all field overhead was included in Maris's direct costs. As for home office overhead, the day-to-day operations were handled and paid for by SCC [a surety company Maris hired to protect its interests]. There is no evidence that these costs were charged back to Maris; if they were, testimony to that effect could have been easily adduced. All that remains is some unspecified overhead incurred by Maris's payroll department for all of its multiple projects. That is not sufficient to support an overhead award.

163 F.Supp. at 192.

On both scores, *Maris* is distinguishable from the case at bar. As for profit, there is in the record no project report or other document binding upon Aniero which recites a contemplated profit of any particular percentage of job costs. Aniero has

simply combined its profit and overhead claims within the 15%-of-job costs formula which has been repeatedly sanctioned by the New York courts. As for overhead, Aniero's home office overhead costs were not paid by a third party, as in *Maris;* there was proof of other overhead expenses; and the evidence shows that the Morris High School project engaged virtually all of the construction capacity of Aniero, a relatively small company, during the relevant period of time.[32]

In his testimony Guerrero referred to an annual construction industry publication, the *Means Construction Handbook,* which he described as "the bible of the construction industry estimating for costs." Re. 961. From that publication Guerrero derived a 3½ % figure for profit as being at the high end. The difficulty with this testimony is that, as demonstrated during cross-examination, Guerrero testified at his pre-trial deposition that the "appropriate markup" for profit of between 2½ and 4% he derived from *Means* referred to the services of construction managers (like KBF) and not general contractors (like Aniero); and it is readily perceivable that on a project of this magnitude, a general contractor on a fixed price contract runs a greater economic risk of loss than does a construction manager, and consequently could expect a greater reward if the job goes well.

It is also telling to consider Guerrero's actions when, after Aniero left the job,

KBF took over the general contractor's responsibilities at the Project. SCA presented a claim against Aetna which Guerrero vetted. His analysis, set forth in a report, PX 1261, considered SCA's claim against Aetna for KBF's services as a general contractor; recited that the "added cost to completion" was $520,000, and then said: "Ten per cent (10%) overhead costs and ten per cent (10%) profit should be added to this number." In point of fact, when Guerrero then turned this formula into numbers, he calculated the 10% overhead charge on the $520,000 completion cost, giving a subtotal of $572,000 ($520,000 plus 10% or $52,000), and then figured the 10% profit allowance on *that enhanced amount,* so that the profit component was $57,200 (10% of $572,000). There is an obvious tension between KBF's allowed recovery of a total of 20% of costs to cover overhead and Aetna's argument that Aniero's 15 % total is excessive. Aetna argues that the SCA's arrangement with KBF was contractual and Aniero's claim sounds in *quantum meruit.* The distinction is valid, so far as it goes, but it dos not go very far. Neither SCA nor any other participant in this Project gives the impression of cheerfully showering anyone else with unreasonably generous amounts of money. While the percentage allowances for overhead and profit that KBF received from SCA as successor general contractor are not binding on Aetna in the context of Aniero's claim, those allowances are as probative as anything in

---

**32.** Counsel for Aetna brought out that in a previous deposition Crevani had said that Aniero was performing "several" other jobs "in early March of 1994." Tr. 616. Apparently that subject was not further pursued at the deposition. On redirect examination at trial, Crevani testified that at that time

Aniero had only one major job going. We were doing closeout for one or two other jobs which was very, very minute. Basically, as far as actually performing a large

volume of work was only one job going at the time other than Morris High School. Tr. 766. The last sentence of this quotation seems somewhat garbled, and one may question the complete accuracy of the transcript. I construe Crevani's testimony to be that the Morris High School project was the major project upon which Aniero was engaged during the time covered by its *quantum meruit* claim. That interpretation is consistent with all the other evidence, and I find it to be the fact.

*Means* about the prevailing industry practices, and support Aniero's claim for a 15% of costs figure covering both overhead and costs.

In summary, that 15% figure is sanctioned by the New York cases and is not undermined by any evidence in this case. I will allow a 15% addition to Aniero's actual job costs, that amount to be calculated in a manner consistent with the other Parts of this Opinion.

### G. Prejudgment Interest

Aniero claims prejudgment interest in accordance with New York law. Aetna contends that in the circumstances of the case, no prejudgment interest should be awarded.

 "In a diversity case, prejudgment interest is controlled by the rule of the jurisdiction whose law determines liability." *N. Bloom & Son (Antiques) Limited v. Skelly,* 673 F.Supp. 1260, 1269 (S.D.N.Y. 1987). In this case that jurisdiction is New York. The relevant provisions are found in Art. 50 of the N.Y. CPLR. § 5001(a) provides: "Interest shall be recovered upon a sum awarded because of breach of performance of a contract, ... except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." § 5001(b) provides:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all the damages from a single reasonable intermediate date.

¶ 5004 provides: "Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."

 Aetna contends that since *quantum meruit* is equitable in nature, CPLR ¶ 5001(a) gives the Court discretion to award or deny prejudgment interest in this case. That contention is contrary to New York authority. While as noted in Part II.A., *supra,* the roots of *quantum meruit* are found in principles of equity, for purposes of prejudgment interest the remedy is likened to one for breach of contract, and an award of prejudgment interest is mandatory. *See, e.g., Ogletree, Deakins, Nash, Smoak & Stewart, P.C. v. Albany Steel Inc.,* 243 A.D.2d 877, 663 N.Y.S.2d 313, 315 (3d Dep't 1997):

> Turning to the issue of interest, we reject defendant's characterization that plaintiff's claim is "equitable" and, therefore, any award of interest was discretionary (*see,* CPLR 5001[a] ). Plaintiff's *quantum meruit* action is essentially an action at law, inasmuch as it seeks money damages in the nature of a breach of contract, notwithstanding that the rationale underlying such causes of action is fairness and equitable principles in a general, rather than legal, sense. Thus, Supreme Court was *required* to award interest.

(internal quotation marks and citations omitted) (emphasis added). *See also Maris,* 163 F.Supp.2d at 202 ("New York's law providing for a nine percent per annum rate of prejudgment interest in contract actions extends to *quantum meruit* recoveries in quasi-contract actions.... Maris is *entitled* to nine percent per annum prejudgment interest from May 3, 1996.") (citing New York cases, including *Ogletree* ) (emphasis added).[33]

**33.** Aetna relies upon Judge Batts's decision in *Sequa Corp. v. Gelmin,* No. 91 Civ. 8675, 1997 WL 218470, at *3 (S.D.N.Y. April 30, 1997), citing *Morgan v. Onassis,* 5 N.Y.2d 732, 177 N.Y.S.2d 714, 152 N.E.2d 670 (Ct.App.1958), for the general proposition that the award of prejudgment interest is discretionary in all

■ With one exception, prejudgment interest on Aniero's damages will run from December 22, 1994, that being the date that Aniero left the Project and filed this action. While Aniero's payments to subcontractors, recoverable from Aetna in *quantum meruit*, were made at various times, and Aniero performed its own services at various times, December 22, 1994 may be taken as that "single reasonable intermediate date" contemplated by CPLR § 5001(b). The exception relates to Aniero's subsequent settlement payment to Degmor (in the amount of $150,000, but allowable in *quantum meruit* in the lesser amount of $100,000, for the reasons stated *supra*). That is an item of Aniero's damages "incurred thereafter"; consequently interest on that amount "shall be computed from the date incurred," CPLR ¶ 5001(b), which in this case would be the date Aniero paid the settlement funds to Degmor. Accordingly, Aniero's calculation of prejudgment interest must be a two-tiered exercise.

## H. Aetna's Attempted Revival of Aniero's Abandonment of the Project as a Defense

After devoting 82 pages to contesting Aniero's *quantum meruit* claim, Aetna's Main Post–Trial Brief concludes with a 3–page argument that at the trial Aniero "relied upon" the completion contract it signed with Aetna and accordingly "waived its right to object to Aetna's contract defenses," specifically, that Aniero abandoned the Project, with the result that "Aniero's *quantum meruit* claim should be dismissed in its entirety as New York law and the doctrine of substantial performance protect Aetna from such a claim by Aniero as it abandoned the Project and failed to prove that the work left to perform was slight or insubstantial." *Id.* at 82–84.

In its disregard of the Court's prior opinions in this case, Aetna's argument is the equivalent of, and as futile as, a contention by Adam that the Garden of Eden should be restored to its paradisiacal state before Eve bit into the apple. In the opinion reported at 1998 WL 148324, at *2–5, I held that the completion contract between Aniero and Aetna was invalid and unenforceable because a condition precedent to its formation had not been fulfilled, namely, the written consent of the SCA. In the opinion reported at 2000 WL 863208, at *9–10, I specifically rejected Aetna's contention "that Aniero's allegedly unjustified abandonment of the Project prior to its completion entirely precludes recovery in *quantum meruit*," reasoning that "since *quantum meruit* requires the *absence* of a valid contract," the issue of whether Anie-

---

*quantum meruit* cases. Both *Sequa* and *Morgan* involved actions to enforce attorney's liens for professional services rendered. While in *Sequa* Judge Batts characterized such an action as one in the nature of *quantum meruit*, the New York Court of Appeals did not do so in *Morgan;* and these quite different cases do not alter the rule of the New York cases cited in text.

Even if I had discretion to deny Aniero's claim for prejudgment interest, I would not exercise it in Aetna's favor. Aetna's briefs on this point reiterate the criticisms of the nature and quality of Aniero's proof that Aetna un-

successfully articulated in seeking to defeat Aniero's claims on the merits; such arguments fare no better in the present context of prejudgment interest. As for the suggestion that Aniero inequitably delayed these proceedings, the filing of this action on the day Aniero left the Project would seem to be sufficiently prompt. The most striking instance of inequitable delay revealed by the trial record is Guerrero's unexplained and inexplicable failure (or refusal) to hand over to Aniero a check for an amount in excess of $300,000 which Aetna had drawn to Aniero's order.

ro justifiably abandoned the Project "has no proper place in a *quantum meruit* claim, as it might in a breach of contract cause of action under the doctrine of substantial performance."

These rulings constitute the law of the case, at least until the Court of Appeals may alter them. It is idle for Aetna to attempt to set up a defense in law to a claim that Aniero cannot assert in law. Crevani referred to the contract in his testimony in order to furnish relevant background for Aniero's *quantum meruit* claim, and to draw distinctions between cost accounting in the differing worlds of contract and *quantum meruit*. Nothing in that testimony operates to bar the *quantum meruit* claim which the parties tried to the Court. Aniero could not have asserted a contract claim at trial even if it wanted to, and Aetna cannot assert a contract defense after trial even though it wants to. The cases Aetna cites are inapposite. There is no substance to this last-ditch defensive effort.

## III. CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action and personal jurisdiction over the parties to it.

2. Plaintiff Aniero Concrete Company, Inc. is entitled to a judgment against defendant Aetna Casualty and Surety Company in an sum comprised of (a) the total amount of Aniero's actual job costs incurred on the Morris High School Project, calculated in accordance with the Court's rulings, holdings, allowances and disallow-

ances contained in this Opinion, and (b) 15 % of the amount referred to in ¶ 2(a) of these Conclusions of Law, as an allowance for overhead and profit.

3. The judgment will further provide that on the amount which results from the implementation of ¶ 2 of these Conclusions of Law, Aniero is to receive prejudgment interest at the rate of 9 % per annum, noncompounded, from the dates consistent with the relevant rulings contained in this Opinion.

\* \* \* \* \* \*

Counsel for plaintiff are directed to settle a Judgment consistent with this Opinion on seven (7) days notice. Counsel are further directed to serve and file with the Notice of Settlement an affidavit setting forth in detail the manner in which the dollar amounts contained in the Judgment were calculated. That analysis should include a calculation of the daily amount of prejudgment interest accruing between the time the Judgment is submitted and its entry by the Court.

It is SO ORDERED.